[No. B084200. Second Dist., Div. One. Jan. 26, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
VAL LAMAR SMITH, Defendant and Appellant.

**COUNSEL**

Marcia C. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**VOGEL (Miriam A.), J.**—We are asked in this case to extend the "good faith" exception to the Fourth Amendment's exclusionary rule to salvage a confession obtained in violation of the Fifth Amendment. We decline.

BACKGROUND

James Powell was at Yvonne Lane's apartment when Appellant Val Lamar Smith (who is deaf) and four other men ("Howard," "Vincent" and two others who remained nameless) arrived. Smith and Powell argued. Vincent handed a gun to Smith, who fired three shots at an unarmed Powell (killing him), then gave the gun back to Vincent and left the apartment.

Smith's wallet was found at the scene and he was arrested. Through a sign language interpreter (Cheryl Fernandez), Smith was told he was being questioned about "the incident that happened, the shooting," and was advised of his *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16

L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) This is what happened next (the interview was videotaped and audiotaped):

DETECTIVE FISK: "Keeping these rights in mind, do you wish to talk to me about this?"

SMITH (through Fernandez): *"I don't really. I prefer to go to court and see what happens.* In. In the case. In the case. In the case? What I mean . . . is if you sue me, or not sue me, but to have a . . . a lawyer, because."[1] (Italics added.)

DETECTIVE FISK: "OK. And do I understand that he does not want to discuss this at all?"

FERNANDEZ (for herself, not for Smith): "Wait! Wait! Slow down! Excuse me, I have to explain something. Please wait until I finish, because if not. The interpreter is talking right now. If you don't wait until I finish then . . . it will change the meaning of what they are saying. OK? Go ahead."

DETECTIVE FISK: "Do I understand him correctly in that he doesn't want to explain to us what happened?"

SMITH (through Fernandez): "Oh! Oh, I get it! OK, yeah. I'll go ahead and talk."

FERNANDEZ (for herself, not for Smith): "Excuse me the interpreter wants to say something. Can you please sign, and take your hands off me? And you know, I don't know, but sign real clear, OK? OK."

DETECTIVE FISK: "Did I misunderstand at first that?"

SMITH (through Fernandez): "Yes. Yeah, now I understand clearly. OK, let's go ahead."

Smith first told Detective Fisk that one of the other men had fought with Powell and shot him. After Detective Fisk said he knew Smith was the

---

[1]There is no dispute about Smith's first two statements (the portion emphasized in the text) but Fernandez later testified that Smith had not signed that he wanted "a lawyer, *because*" but rather that he wanted "a lawyer *in court.*"

shooter, Smith said Howard had handed guns to Smith and Vincent, that he (Smith) had shot Powell twice in the leg, but that it was Vincent who shot Powell in the head and killed him.

A complaint was filed charging Smith with Powell's murder. At Smith's preliminary hearing, Yvonne Lane (who is also deaf) testified that Smith was the shooter but conceded on cross-examination that she had "mistakenly" told an investigator and at least one friend that Vincent was the shooter. Based on Lane's testimony and Smith's statements to the police, Smith was held to answer and an information was filed charging him with first degree murder (with an armed principal enhancement allegation).

Smith moved to suppress his statements to the police. After a lengthy hearing, the trial court found that Smith understood his rights and unequivocally invoked them by requesting a lawyer—but that Detective Fisk's further questions to clarify Smith's response were pursued in good faith and that, therefore, Smith's statements should not be suppressed. Accordingly, the motion was denied. Smith then submitted the question of his guilt to the court on the transcript of the preliminary hearing and, pursuant to a negotiated disposition, the use enhancement was stricken and he was convicted of second degree murder. Smith appeals.

## DISCUSSION

Smith contends the police officer's good faith is immaterial in light of the trial court's finding that Smith had unequivocally invoked his right to counsel. We agree.

### I.

Sign language experts testified at the hearing to determine the admissibility of Smith's statements.[2] They explained that there are several different types of sign language, that a single sign may have multiple meanings and that, conversely, a single word or concept may be signed in various ways. They explained the need for specialized training in the legal field and the various problems encountered with minimally educated people and cross-cultural interpretation. Not surprisingly, the People's experts opined that Fernandez's interpretation at Smith's interview was accurate, the defense experts that it was not.

---

[2]The experts all listened to the audiotape or watched the videotape or both. All of them read the transcript of the audiotape. The defense expert, who is deaf and who testified through an interpreter, watched the videotape but obviously was unable to listen to the audiotape.

The trial court adopted the defense expert's opinion, found that Smith "understood enough of the *Miranda* [warnings] to understand what he was doing," that Fernandez did not understand Smith's response and thus interpreted it incorrectly, and that Smith did *not* waive his rights—because he "said he wanted a lawyer right here, right now . . . , that it was unequivocal and that he wanted a lawyer then and there." But the court did not stop there. It also found that Detective Fisk's "clarifying questions" and Smith's responses led the detective to believe Smith "had waived his rights and . . . that it was done properly. I find that the detectives did nothing wrong in the way they handled the case." For this reason, the court made "the call that . . . the statement should not be suppressed."

## II.

█ We reject the People's suggestion that the trial court's factual findings are not supported by substantial evidence. (*People* v. *Clair* (1992) 2 Cal.4th 629, 678 [7 Cal.Rptr.2d 564, 828 P.2d 705]; *People* v. *Mickey* (1991) 54 Cal.3d 612, 649 [286 Cal.Rptr. 801, 818 P.2d 84] [although we review legal issues de novo, we accept the trial court's factual findings if they are supported by substantial evidence].) Dr. Lawrence Fleischer, a professor of special education and sign language interpretation, testified that Smith's first response to Detective Fisk was an unequivocal invocation of his right to counsel.[3] No more was required. (Evid. Code, § 411; *People* v. *Allen* (1985) 165 Cal.App.3d 616, 623 [211 Cal.Rptr. 837] [the testimony of one witness is sufficient to constitute substantial evidence].)[4]

We also reject the People's contention that Smith's response, as interpreted by Fernandez, was sufficiently ambiguous to justify Detective Fisk's further inquiry to determine whether Smith was, in fact, asserting his right to

---

[3]The trial court's findings were supported not only by Dr. Fleischer's testimony but also by (1) Fernandez's admission that she had difficulty understanding Smith's response to Detective Fisk's first question and (2) the testimony of the People's expert, Marcella Meyer, that Fernandez "had some problems" interpreting the interview.

[4]At the hearing to determine the admissibility of Smith's statements to the police, the only disputed fact was whether Smith had invoked his right to counsel. As noted in the text, Dr. Fleischer testified that he did so. For reasons we do not understand, however, the parties have simply ignored the fact that, without any ambiguity at all, Smith clearly invoked his right to remain silent. Detective Fisk asked, "[D]o you wish to talk to me about this?" Smith answered: *"I don't really. I prefer to go to court and see what happens."* (Italics added.) No more was required. (*People* v. *Pack* (1988) 201 Cal.App.3d 679, 690 [248 Cal.Rptr. 240] [no particular form of words or conduct is necessary to invoke Fifth Amendment privileges]; *People* v. *Russo* (1983) 148 Cal.App.3d 1172, 1176 [196 Cal.Rptr. 466] [a suspect may invoke his right to silence by any words or conduct reasonably inconsistent with a present willingness to discuss his case freely and completely].)

counsel. Although clarifying questions are permitted when it is *unclear* whether the defendant has invoked his rights (*Davis* v. *U.S.* (1994) 512 U.S. __ [129 L.Ed.2d 362, 373, 114 S.Ct. 2350, 2357] ["we are unwilling to create a . . . layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer [and u]nless the suspect actually requests an attorney, questioning may continue"]; *People* v. *Pack, supra,* 201 Cal.App.3d at pp. 690-691; *In re Brian W.* (1981) 125 Cal.App.3d 590, 599-600 [178 Cal.Rptr. 159]; *People* v. *Turnage* (1975) 45 Cal.App.3d 201, 210-211 [119 Cal.Rptr. 237]), the trial court's factual determination that Smith *unequivocally* invoked his right to counsel (and the undisputed fact that he *unequivocally* invoked his right to remain silent) disposes of the suggestion that there existed any ambiguity and, necessarily, thus eliminates the justification for further questioning. (*Smith* v. *Illinois* (1984) 469 U.S. 91, 99 [83 L.Ed.2d 488, 496, 105 S.Ct. 490] [no authority, and no logic, permits the interrogator to proceed on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he did not wish to speak]; *People* v. *Carey* (1986) 183 Cal.App.3d 99, 102-104 [227 Cal.Rptr. 813]; *People* v. *Russo, supra,* 148 Cal.App.3d at p. 1177.)

Accordingly, Smith's assertion of his rights should have put an immediate end to the interview. As the Supreme Court explained in *Miranda* v. *Arizona, supra,* 384 U.S. at pages 473-474 [16 L.Ed.2d at page 723], when the defendant "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. [Fn. omitted.] At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." (See also *Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-486 [68 L.Ed.2d 378, 385-387, 101 S.Ct. 1880]; *People* v. *Carey, supra,* 183 Cal.App.3d at p. 103 [the "clarification rule" requires ambiguity as a precedent to further inquiry].)

III.

The continuing validity of *Miranda* is not questioned in this case. Rather, the issue is whether the trial court was entitled to dilute the rule by applying the "good faith" exception developed in Fourth Amendment cases to this Fifth Amendment violation.

## A.

Otherwise admissible evidence, if obtained in violation of a defendant's Fourth Amendment rights, is generally made inadmissible by the exclusionary rules adopted in *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513] and *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933]. In *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405], however, the Supreme Court adopted a "good faith" exception to the exclusionary rule by holding that evidence obtained in objectively reasonable reliance on a defective search warrant is admissible. (See also *People* v. *Helmquist* (1984) 161 Cal.App.3d 609 [207 Cal.Rptr. 718].) As *Leon* reminds us, the exclusionary rule is designed to deter police misconduct, not judicial error. (*United States* v. *Leon, supra*, 468 U.S. at p. 916 [82 L.Ed.2d at p. 694].) Assuming the rule accomplishes its goal and does in fact deter some police misconduct, there is nothing to deter when a police officer acts in objective good faith reliance on a search warrant issued by a judge or magistrate. (*Id.* at pp. 919-920 [82 L.Ed.2d at pp. 696-697].) "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." (*Id.* at p. 921 [82 L.Ed.2d at p. 697].)

## B.

Similarly, statements otherwise admissible as admissions, if obtained in violation of a defendant's *Miranda* rights, may not be used against him at a criminal trial. (*Oregon* v. *Elstad* (1985) 470 U.S. 298, 307 [84 L.Ed.2d 222, 231, 105 S.Ct. 1285] ["unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*"].) This however, is where the similarity ends.

As noted above, the Fourth Amendment's exclusionary rules are designed to deter police misconduct. In contrast, evidence obtained in violation of the Fifth Amendment rights protected by *Miranda* is excluded to ensure protection of the suspect's right against compulsory self-incrimination. (*New York* v. *Quarles* (1984) 467 U.S. 649, 654 [81 L.Ed.2d 550, 555-556, 104 S.Ct. 2626].) Stated otherwise, the "purpose of the *Miranda* warnings . . . is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights." (*Moran* v. *Burbine* (1986) 475 U.S. 412, 424-425 [89 L.Ed.2d 410, 422-423, 106 S.Ct. 1135].)

## C.

This fundamental difference in the theoretical underpinnings of the Fourth and Fifth Amendment exclusionary rules persuades against application of the "good faith" exception in Fifth Amendments cases. This is not a novel distinction. For example, although a suspect *cannot* waive his Fifth Amendment rights unless he has been told what those rights are (*Miranda* v. *Arizona, supra*, 384 U.S. at p. 469 [16 L.Ed.2d at pp. 720-721]), he *can* waive his Fourth Amendment rights unencumbered by any awareness that he has the right to do otherwise. (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 241 [36 L.Ed.2d 854, 871, 93 S.Ct. 2041] [since there "is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment," a suspect may waive his Fourth Amendment rights by consenting to a search without knowing he has the right to refuse].) For another example, the prime consideration in determining whether a new rule affecting Fourth Amendment rights will be applied retroactively is its deterrent effect on police misconduct; conversely, the retroactivity of rules affecting Fifth Amendment rights turns on the guaranty of "full effectuation of the privilege against self incrimination, the mainstay of our adversary system of criminal justice." (*Johnson* v. *New Jersey* (1966) 384 U.S. 719, 729 [16 L.Ed.2d 882, 890, 86 S.Ct. 1772].)[5]

## D.

For these reasons, the trial court's finding that Smith had unequivocally invoked his Fifth Amendment rights is dispositive of Smith's motion to suppress and it is immaterial whether Detective Fisk was acting in good faith when he pursued the matter further. It follows that the motion to suppress should have been granted and that the trial court's denial of that motion was error. It also follows ineluctably, on the facts of this case and in light of the negotiated disposition, that the error was prejudicial. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Russo, supra,* 148 Cal.App.3d at p. 1178.) Without Smith's

---

[5]For yet another example, evidence obtained in violation of the Fourth Amendment which, in turn, discloses the existence of other evidence may be admissible if it is sufficiently attenuated from the fruit of the poisonous tree. (*Brown* v. *Illinois* (1975) 422 U.S. 590, 602 [45 L.Ed.2d 416, 426, 95 S.Ct. 2254]; *Taylor* v. *Alabama* (1982) 457 U.S. 687, 690 [73 L.Ed.2d 314, 319, 102 S.Ct. 2664]; *Oregon* v. *Elstad, supra,* 470 U.S. at pp. 305-306 [84 L.Ed.2d at pp. 229-230].) But a *Miranda* violation, which creates "a presumption of compulsion," make otherwise *voluntary* statements inadmissible because "*Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm." (*Oregon* v. *Elstad, supra,* 470 U.S. at p. 307 [84 L.Ed.2d at p. 231]; see also *People* v. *Briggs* (Colo. 1985) 709 P.2d 911, 918-919 [709 P.2d 911].)

statements to the police, the only evidence identifying him as the shooter is Yvonne Lane's testimony at the preliminary hearing, which was impeached. Smith's conviction is based upon his submission to the trial court on the transcript of the preliminary hearing—and the trial court made it clear that it relied in substantial part on Smith's statements in arriving at its judgment. Under these circumstances, there is no way to say the error was harmless.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to grant Smith's motion to suppress and to set the case for trial.

Ortega, Acting P. J., and Masterson, J., concurred.

A petition for a rehearing was denied February 16, 1995, and on February 27, 1995, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 27, 1995.