[No. A099675. First Dist., Div. Three. Sept. 30, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
NICHOLAS C. JENKINS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 2 and 3 of the Discussion.

## Counsel

Philip M. Brooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Sharon R. Wooden, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**POLLAK, J.**—Defendant Nicholas C. Jenkins was convicted by a jury of first degree murder and attempted murder and sentenced to prison for a term of 25 years to life. On appeal, he contends the trial court erred in denying his motion to suppress statements he made to the police on two occasions. He also contends the prosecutor impermissibly exercised peremptory challenges to remove six African-Americans from the jury, and that the trial court erred by failing to give a unanimity instruction. We conclude that the first statements defendant made to the police, while voluntary under the Fifth Amendment to the United States Constitution, nonetheless were the product of an illegal detention and should have been suppressed under the Fourth Amendment to the United States Constitution. The connection, however, between the illegal detention and defendant's second statements, made voluntarily after being out of custody for three days, was sufficiently attenuated to dissipate the taint of the illegal detention. Because defendant's second statements, in which he confessed to the crimes, were admissible, the error with regard to the admission of the first statements was not prejudicial. We reject defendant's remaining arguments and, accordingly, affirm the judgment.

### Factual and Procedural History

At approximately 10:00 p.m. on April 29, 1999, Shawn Malvo and Kenneth Scott were shot in East Oakland. An unidentified person who reported hearing gunshots at 79th Avenue and Rudsdale Street called the

police. When the police arrived they found Malvo lying in the street. He had been shot several times in the head, shoulder, arm and chest and was pronounced dead at the scene. Scott was found lying on the sidewalk two blocks away. He was bloody and had been shot in the chest, abdomen and forearm, but could not identify who had shot him. He explained that he had been shot on 79th Avenue and had run away before collapsing. An ambulance took Scott to the hospital where he was admitted in critical condition.

The police were unable to find anyone who had witnessed the shooting, but one witness reported seeing a white Bronco or Blazer back up and run into her neighbor's car shortly after the shots were fired and then speed down the street as though the driver "was trying to get away from something." Sergeant Derwin Longmire identified several cars that appeared to have been struck, including at least one car that had a white paint transfer.

Shortly after the incident, Officer Jason Anderson was advised over his police radio to be on the lookout for a white SUV (sports utility vehicle) with a brown paint transfer and a flat tire. About 1:40 a.m., Anderson saw a white Chevy Blazer on 80th Avenue with right fender damage and a brown paint transfer. Anderson saw the car go through a stop sign without stopping and turn into the driveway of a nearby apartment complex. When the car stopped at the security gate, Anderson approached the vehicle and asked the driver for identification. Defendant was driving the car and was unable to produce any identification. Anderson arrested defendant and put him in the back of his police car. At that time he noticed the Blazer had a spare tire on the left front wheel. Anderson called Sergeant Longmire to advise him of the traffic stop and then transported defendant to the police station. At approximately 2:25 a.m., Anderson placed defendant in a locked interview room in the homicide division. Defendant was not booked on any charges prior to being turned over to the homicide inspectors.

At 4:33 a.m. Longmire entered the interview room and required defendant to submit to a gunshot residue test, the result of which was later determined to be negative. Longmire went back into the room at 5:07 a.m. and a few minutes later read defendant his *Miranda*[1] rights. Defendant said he understood his rights and initialed a form indicating that he understood and was willing to waive those rights and talk to the police. Longmire initially interviewed defendant from 5:07 until 7:43 a.m. Longmire's notes taken during this interview indicate that the two talked about the traffic stop and defendant's personal information. Longmire later testified that he used this time to establish rapport with defendant before asking about the shootings.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

After an almost four-hour break—close to noon—Longmire returned to interview defendant and took his taped statement. Defendant explained that he and some friends were in an apartment in the 1100 block of 79th Avenue when a Blazer pulled up next to a white car with two men in it. Two other men, identified as Shawn Marbley and Charlie Brown, got out of the Blazer and asked the two in the white car for money. When the men in the car said they did not have it yet, Marbley fired 10 or 11 rounds at the two men. One of the men fell on the ground and the other ran away. Marbley chased the man who ran, caught him on the corner of 77th Avenue, and beat him with his gun. Charlie Brown sped away in the Blazer, hitting a brown van, a blue car and a fire hydrant as he left. Charlie Brown parked the Blazer and gave the key to Timothy Garrett. Defendant denied having anything to do with the shooting, but admitted he knew the car had been involved in the shooting when he later borrowed it from Timothy Garrett.

Longmire interviewed defendant again at 5:30 p.m. in order to permit defendant to correct any erroneous statements he had made during the prior interview. Defendant then told Longmire that before the shooting, Marbley told him that he was meeting with a man who owed him a lot of money and that he planned to kill the man if he didn't have his money. Marbley had told the man to meet him at 79th Avenue and Rudsdale Street. When the man arrived, Marbley fired five or six gunshots at the car. The car jumped the curb and crashed into a fire hydrant. Marbley dragged the driver out of the car and shot him five or six times as he tried to crawl away. The passenger fled down the street and Marbley shot him as well. At Marbley's request, defendant chased the man and caught him on 77th Avenue and held him until Marbley arrived. Marbley pistol-whipped the man and kicked him in the mouth. Defendant then selected Marbley's photograph from a lineup and identified him as the shooter. Defendant had known Marbley for 10 or 11 years. The interview ended at 6:05 p.m. and defendant was released to go home.

Marbley was arrested two days later, on May 1. Longmire interviewed Marbley and took a statement from him. Early on the morning of May 3, officers woke defendant at his home and asked him to come to the station for additional questioning, which he agreed to do. Defendant was placed in an interview room with Marbley at 2:45 a.m. and the two were jointly interviewed for just over an hour. After the interview, the officers left the two alone in the room for 25 minutes. As Longmire exited, he secretly passed Marbley a tape recorder and indicated he should tape his conversation with defendant. Marbley taped their conversation, but the quality of the recording was poor. Nonetheless, Marbley can be heard on the tape repeatedly accusing defendant of lying and asking defendant to let him go home. A number of times Marbley said that his life was in defendant's hands. Marbley also said, "They're trying to cut you a deal to manslaughter . . . that ain't nothing but a year. If you need money on your books or anything man. I got it man."

Longmire stood outside the door while the men were alone in the room and periodically peeked through the viewing hole to make sure the two were not fighting.

After another 15 minutes alone with Marbley, defendant was taken into a different interview room, where he gave a new statement to the police. He admitted that he, rather than Marbley, was the shooter and that Marbley had not shot or chased anyone that night. He explained that he had called Malvo and asked him to bring some drugs to 79th Avenue and Rudsdale Street, but that when he came he did not have the drugs. Defendant thought Malvo was setting him up so he shot at the car and continued to shoot Malvo as he got out of the car. He also chased Scott down the street and hit him with his gun. Later, defendant stated that he had not intended to buy drugs from Malvo but was planning to rob him. Still later he denied that he planned to rob Malvo.

On May 12, 2000, defendant was charged by amended information with the murder of Shawn Malvo (Pen. Code, § 187, subd. (a)). Count 1 further alleged that defendant committed the murder while engaged in a robbery within the meaning of Penal Code section 190.2, subdivision (a)(17)(A). Count 2 charged defendant with the attempted murder of Kenneth Scott (Pen. Code, §§ 187, 664, subd. (a)). Counts 1 and 2 also alleged that defendant personally used a firearm (Pen. Code, §§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1), 12022.53, subd. (c)), personally and intentionally discharged a firearm (Pen. Code, § 12022.53, subd. (c)), and personally and intentionally discharged a firearm which proximately caused great bodily injury on the victim (Pen. Code, § 12022.7, subd. (b)). Count 3 charged defendant with shooting at an occupied vehicle (Pen. Code, § 246) and also alleged that the offense was a serious felony under Penal Code section 1192.7, subdivision (c)(8). Count 4 charged defendant with assault with a firearm (Pen. Code, § 245, subd. (a)(2)) and also alleged that defendant had personally used a firearm and personally inflicted great bodily injury (Pen. Code, §§ 12022.5, subd. (a)(1), 12022.7, subd. (b)) causing the offense to become a serious and violent felony within the meaning of Penal Code sections 1192.7, subdivision (c)(8) and 667.5, subdivision (c)(8). Defendant pled not guilty and denied the special allegations.

On September 1, 2000, defendant moved to suppress his statements under Penal Code section 1538.5 on the ground that they were the product of an illegal detention in violation of the Fourth Amendment of the United States Constitution and Vehicle Code section 40302. The parties stipulated that the motion could be decided on the preliminary hearing transcript, which included the testimony of Anderson regarding the traffic stop and of Longmire regarding the subsequent police interrogation. The trial court found that the police had probable cause to arrest defendant on the Vehicle Code offense,

but not for murder. The court considered defendant's postarrest detention on the night of April 30 troubling, but concluded nonetheless that the officers had acted reasonably under the circumstances, and therefore denied the motion.

At the start of trial, defendant again moved to suppress his statements, this time on the ground that they were involuntary. Defendant argued that he did not knowingly and intelligently waive his *Miranda* rights and that the police coerced his May 3 confession by placing him alone in the room with Marbley. At the hearing under Evidence Code section 402, Longmire testified again regarding his investigation and interrogation of defendant. Defendant called Dr. Timothy Derning, a psychologist with a specialty in developmental disabilities, who testified that defendant had an I.Q. of only 64, which placed him in the first percentile of the general population. Dr. Derning performed a number of tests on defendant to measure his cognitive functioning, each of which demonstrated significant disability. Dr. Derning also gave defendant a legal forensic test, referred to as the "Grisso test," to determine his ability to understand the *Miranda* waivers. Defendant scored 8 out of 8 for his comprehension of *Miranda* rights, 10 out of 12 for recognition, 8 out of 12 for vocabulary, but only 19 out of 30 for the functional application with hypotheticals. Dr. Derning testified that although defendant appeared superficially to perform adequately on the tests, his score on the application section of the test was worse than 98 percent of those who have taken the test. In his opinion, the test results showed that while defendant could remember the text of the warning, he lacked the ability to understand how to apply it. Defendant's answers indicated that he did not understand the *Miranda* warnings to be protections. He confused the right not to incriminate oneself with perjury, and when asked what would happen if the judge finds that a person did not talk to the police, he answered that the person would get a longer sentence. He also believed the *Miranda* warnings were different for guilty and innocent people. The trial court denied defendant's motion.

During voir dire examination of the prospective jurors, defendant made a motion under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] that was denied.

At trial, the prosecutor called the responding officers, as well as Anderson and Longmire, to testify to the investigation detailed above. Recordings and transcripts of defendant's April 30 and May 3 statements were received in evidence. The prosecutor also called Scott, who testified that he could not remember the night of the shooting but did remember having an acquaintance named "Shawn" (i.e., Malvo). Defendant did not look familiar to him. Testimony was introduced concerning the nature and extent of Scott's injuries. Defendant's only witness was Dr. Derning, who testified again

regarding defendant's developmental deficiencies and their effect on his statements to the police.

The jury found defendant guilty of first degree murder and willful and premeditated attempted murder. The jury was unable to reach a verdict on counts 3 and 4, the use allegations, and the special circumstance allegation. The court dismissed counts 3 and 4 and struck the use allegations from counts 1 and 2. Defendant was sentenced to consecutive terms of life and 25 years to life. Defendant filed a timely notice of appeal.

DISCUSSION

## 1. *Motion to Suppress*

Defendant argues that his incriminating statements to the police on April 30 and May 3 should have been suppressed because they were obtained in violation of his rights under the Fourth and Fifth Amendments to the United States Constitution and under California statutory law. He contends that his statements were involuntary under the Fifth Amendment because he did not knowingly and intelligently waive his *Miranda* rights and because his May 3 confession was the product of undue police coercion. He contends further that he was illegally detained on April 30 without probable cause in violation of the Fourth Amendment, and that his May 3 confession was the "fruit" of the illegal April 30 detention.

" 'The scope of our review of constitutional claims of this nature is well established. We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.' " (*People v. Johnson* (1993) 6 Cal.4th 1, 25 [23 Cal.Rptr.2d 593, 859 P.2d 673].)

Although often factually overlapping, the exclusion of evidence under the Fourth and Fifth Amendments serves different constitutional objectives. As discussed in greater detail below, "the Fourth Amendment's exclusionary rules are designed to deter police misconduct. In contrast, evidence obtained in violation of the Fifth Amendment rights protected by *Miranda* is excluded to ensure protection of the suspect's right against compulsory self-incrimination." (*People v. Smith* (1995) 31 Cal.App.4th 1185, 1192 [37 Cal.Rptr.2d 524].) Accordingly, "[b]ecause of the particular interests protected by the Fourth Amendment, a statement must be suppressed, even when knowing, voluntary, and intelligent, if it is the direct product of an illegal arrest or detention. [Citations.] By proscribing searches and seizures without

adequate cause or judicial authorization, the Fourth Amendment guards, among other things, against the police tactic of 'investigative detention.' " (*People v. Boyer* (1989) 48 Cal.3d 247, 267 [256 Cal.Rptr. 96, 768 P.2d 610], disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].)

We conclude that defendant's statements on both April 30 and May 3 were made voluntarily and were not the product of unduly coercive police tactics. Nonetheless, the unlawful detention of defendant following his arrest for a traffic violation, for the explicit purpose of interrogating him about another crime for which there was no probable cause to arrest him, violated his rights under the Fourth Amendment, requiring exclusion of his April 30 statements. Because the trial court incorrectly concluded that there had been no Fourth Amendment violation, the court did not determine whether defendant's subsequent May 3 confession was the product of the April 30 violation. Nonetheless, it is apparent that it was not. The three days between the two statements, during which time defendant was out of police custody, sufficiently attenuated the May 3 statements from the prior illegal detention. Therefore, the May 3 confession was admissible, and the erroneous receipt of the incriminating April 30 statements was harmless.

a. *Defendant knowingly and intelligently waived his Miranda rights.*

█ A determination of the voluntariness of a defendant's statements must be based upon the totality of the circumstances, including whether defendant was read and understood his *Miranda* rights, defendant's maturity, education and mental health, and any elements of coercion in the interrogation, the length of the interrogation, and its location. (*Withrow v. Williams* (1993) 507 U.S. 680, 693 [123 L.Ed.2d 407, 113 S.Ct. 1745].)

Defendant was read his *Miranda* rights prior to making any statements on April 30 and again after returning to the station on May 3. On both occasions, Longmire read defendant his rights from a standard preprinted form and defendant initialed each right on the waiver form. Defendant contends, however, that despite the warning given by the police, because of his mental deficiencies he did not knowingly and intelligently waive his *Miranda* rights. Whether a defendant has made a knowing and intelligent waiver of these rights depends upon " 'the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused.' " (*Edwards v. Arizona* (1981) 451 U.S. 477, 482 [68 L.Ed.2d 378, 101 S.Ct. 1880].) "A confession of a crime is not inadmissible merely because the accused was of subnormal intelligence, although subnormal intelligence is a factor that may be considered with others in determining voluntariness." (*In re Norman H.* (1976) 64 Cal.App.3d 997, 1001 [136 Cal.Rptr. 145].)

In *In re Norman H.* the court held that defendant's confession was voluntary despite evidence that Norman was a "very unintelligent 15-year-old boy. His intelligence quotient was that of about a 7 or 8 year old (I.Q. 47), which occurs in about 1 out of every 5,000 persons. He is ignorant of the meaning of many words and phrases, even some of the most simple and rudimentary. He is rather simple in his attitude. Rather than belligerent and resistive, he seems eager to please and willing to cooperate." (*In re Norman H. supra,* 64 Cal.App.3d at p. 1002.) The court relied, however, on defendant's own testimony he "knew at the time the police spoke with him that he did not have to talk with them if he did not want to and that he could get an attorney if he wanted one. He knew what he said could be used against him ('He [the police officer] said it could be used in court') although he did not believe it actually would be used. Appellant wanted to talk to the police ('I wanted to tell them what happened') apparently since he did not physically do the killing and believed he would be in less trouble if he told what had occurred. [¶] Appellant's brother-in-law had prior experience with criminal proceedings and had told appellant that a lawyer was also called an attorney and could help him. Appellant had previously watched court proceedings involving his brother-in-law. Appellant at no time indicated he wanted an attorney to help him or that he did not want to talk to police. He felt he would be in less trouble and wanted to blame his codefendant by telling his side of the story." (*Id.* at pp. 1001–1002.)

Here, Dr. Derning testified that defendant suffered from cognitive disabilities. Nonetheless, it appears that despite having a low I.Q., defendant scored reasonably well on at least portions of the tests administered to measure understanding of a *Miranda* warning. Moreover, while Dr. Derning testified that defendant's test results showed that he did not know how to apply his *Miranda* rights, when faced with evidence that defendant had been read his *Miranda* rights seven times in other proceedings and had invoked his right to remain silent on four of those occasions, Dr. Derning said, "I can't say that he has no understanding of what's going on. Clearly he does. And in the beginning when I asked him what does it mean you have the right to remain silent and he goes through that, he does quite well explaining those facets of it." This evidence supports the trial court's finding that the "bottom line was that Dr. Derning said that Mr. Jenkins did have an adequate and sufficient understanding of [his *Miranda*] rights based on [the Grisso] test." The trial court also took into account "the fact that Mr. Jenkins appeared to be very street smart. He had contact with law enforcement before, and initially he waived these rights and gave a statement implicating Shawn." Accordingly, there is ample support for the trial court's conclusion that defendant

knowingly and intelligently waived his *Miranda* rights.[2] Defendant does not challenge the voluntariness of his April 30 statements on any other grounds.[3]

b. *Defendant's May 3 confession was voluntary.*

Defendant contends his May 3 confession was involuntary because his mental deficiencies rendered him particularly susceptible to suggestion and the use of Marbley to induce him to confess was unduly coercive. He argues, "As Sergeant Longmire acknowledged, in essence, the interrogation was a three against one situation, with both police officers and Marbley pressuring [defendant] to change his previous denial of culpability. [¶] During the one-on-one confrontation between them, Marbley made numerous references to manslaughter and to a short, one-year prison term. . . . If the officers had said this, it would have been a promise of leniency, making the subsequent confession inadmissible. [¶] [Defendant's] ultimate confession can only reasonably be seen as a result of the pressure placed on him by the police and Marbley."

■ Defendant does not argue that Marbley was acting as an agent of the police or under their instructions in making these statements, and there is no evidence to support such a suggestion. Accordingly, Marbley's promise of leniency cannot be attributed to the police. In addition, there was nothing improper or coercive about placing defendant and Marbley alone together in the holding cell and secretly tape-recording their conversation. Defendant was unaware that Marbley was taping their conversation; from his perspective he was talking to a friend. The element of coercion therefore was missing. (See *Illinois v. Perkins* (1990) 496 U.S. 292, 297 [110 L.Ed.2d 243, 110 S.Ct. 2394] ["*Miranda* forbids coercion, not mere strategic deception by taking

---

[2] *Brown v. Crosby* (S.D.Fla 2003) 249 F.Supp.2d 1285, relied upon by defendant, is distinguishable. The defendant in *Brown* was a juvenile with an I.Q. of between 54 and 58. (*Id.* at p. 1299.) The court held that the waiver of the *Miranda* rights was not knowing and intelligent because the police officers suspected that defendant had an "organic brain dysfunction" but failed to take extra time to explain his rights, and because the undisputed evidence showed that defendant would only have the ability to understand his rights in a very basic way. (*Brown v. Crosby, supra,* at pp. 1300–1301.) Moreover, whether a particular defendant understood and knowingly waived his rights is essentially a factual question, which we review only for substantial evidence. (*People v. Johnson, supra,* 6 Cal.4th at p. 25; *People v. Duren* (1973) 9 Cal.3d 218, 238 [107 Cal.Rptr. 157, 507 P.2d 1365].)

[3] The delay in arraigning defendant in this case, discussed below, did not render his statements involuntary under the Fifth Amendment in light of his express *Miranda* waivers and the absence of any additional coercive conditions. (*People v. Turner* (1994) 8 Cal.4th 137, 167 [32 Cal.Rptr.2d 762, 878 P.2d 521], overruled on different grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Thompson* (1980) 27 Cal.3d 303, 329 [165 Cal.Rptr. 289, 611 P.2d 883], disapproved on another ground in *People v. Rowland* (1992) 4 Cal.4th 238, 260 [14 Cal.Rptr.2d 377, 841 P.2d 897]; *People v. Powell* (1967) 67 Cal.2d 32, 60 [59 Cal.Rptr. 817, 429 P.2d 137].)

advantage of a suspect's misplaced trust"]; *People v. Webb* (1993) 6 Cal.4th 494, 524–526 [24 Cal.Rptr.2d 779, 862 P.2d 779] [statements made in recorded telephone conversations between the jailed defendant and his girl-friend were voluntary, even though she was secretly cooperating with the police].) Accordingly, defendant's May 3 statement, in which he admitted that it was he who shot both victims, was voluntary for purposes of the Fifth Amendment.

c. *Defendant's April 30 statements were obtained in violation of the Fourth Amendment and should have been suppressed.*

 Defendant contends his April 30 statements were obtained in violation of the Fourth Amendment because his postarrest detention was unlawfully prolonged to enable Longmire to question him about the shootings without having probable cause to arrest him.[4] In *Gerstein v. Pugh* (1975) 420 U.S. 103, 125 [43 L.Ed.2d 54, 95 S.Ct. 854], the United States Supreme Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest. In *County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 56 [114 L.Ed.2d 49, 111 S.Ct. 1661] (*McLaughlin*), the court held that a *prompt* judicial determination of probable cause is one that occurs within 48 hours. In setting this time frame, the court relied upon the " 'practical compromise' " struck in *Gerstein* between the rights of individuals and the realities of law enforcement. (*McLaughlin, supra,* at p. 53.) "On the one hand, States have a strong interest in protecting public safety by taking into custody those persons who are reasonably suspected of having engaged in criminal activity, even where there has been no opportunity for a prior judicial determination of probable cause. [Citation.] On the other hand, prolonged detention based on incorrect or unfounded suspicion may unjustly 'imperil [a] suspect's job, interrupt his source of income, and impair his family relationships.' " (*Id.* at p. 52.) While the court held that 48 hours would generally comport with the Fourth Amendment, it expressly stated,

---

[4] Defendant also contends he was unlawfully detained in violation of Vehicle Code section 40302, which provides in relevant part: "Whenever any person is arrested for any violation of this code, not declared to be a felony, the arrested person shall be taken *without unnecessary delay* before a magistrate within the county in which the offense charged is alleged to have been committed and who has jurisdiction of the offense and is nearest or most accessible with reference to the place where the arrest is made in any of the following cases: [¶] (a) When the person arrested fails to present his driver's license or other satisfactory evidence of his identity for examination." (Italics added.) For the same reasons that defendant's detention violated the Fourth Amendment, the police undoubtedly violated section 40302 of the Vehicle Code. Nonetheless, under Proposition 8 approved by the voters in 1982 (Cal. Const., art. I, § 28, subd. (d)), the fact that the detention violated the California statute provides no basis for excluding the statement; the statement must be excluded only if so required by the federal Constitution. (*People v. Sapp* (2003) 31 Cal.4th 240, 270 [2 Cal.Rptr.3d 554, 73 P.3d 433]; *People v. McKay* (2002) 27 Cal.4th 601, 607–608 [117 Cal.Rptr.2d 236, 41 P.3d 59].)

"This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." (*Id.* at p. 56.)[5] The court continued, "Everyone agrees that the police should make every attempt to minimize the time a presumptively innocent individual spends in jail. One way to do so is to provide a judicial determination of probable cause immediately upon completing the administrative steps incident to arrest—*i.e.,* as soon as the suspect has been booked, photographed, and fingerprinted. As JUSTICE SCALIA explains, several States, laudably, have adopted this approach. The Constitution does not compel so rigid a schedule, however." (*McLaughlin,* at p. 58.) Subsequent cases have found prolonged delays in presentment unreasonable "where the delay is based solely on police efforts to investigate additional crimes in which the suspect might have participated." (*U.S. v. Davis* (8th Cir. 1999) 174 F.3d 941, 945; *Willis v. City of Chicago* (7th Cir. 1993) 999 F.2d 284, 289.) In *In re Walters* (1975) 15 Cal.3d 738, 750 [126 Cal.Rptr. 239, 543 P.2d 607], the California Supreme Court held that the *Gerstein* requirement of a prompt judicial determination of probable cause applied to "all misdemeanor post-arrest detentions when the defendant is not released prior to arraignment or at the time of arraignment, and does not waive the probable cause determination."

■ Defendant was arrested without a warrant for driving without a license.[6] (Veh. Code, § 12500, a misdemeanor.) He was detained for over 16 hours and never brought before a magistrate for an independent determination of probable cause. The officers were not engaged in necessary administrative functions related to the traffic offense. The detention was used solely to question defendant about the shootings. Defendant's postarrest detention

---

[5] In *People v. Thompson, supra,* 27 Cal.3d at page 329, the California Supreme Court considered what constitutes unnecessary delay in arraignment under the California Constitution and Penal Code, and observed that " '[t]here is no authority to delay for the purpose of investigating the case. Subject to obvious health considerations the only permissible delay between the time of arrest and bringing the accused before a magistrate is the time necessary: to complete the arrest; to book the accused; to transport the accused to court; for the district attorney to evaluate the evidence for the limited purpose of determining what charge, if any, is to be filed; and to complete the necessary clerical and administrative tasks to prepare a formal pleading.' "

[6] At the suppression hearing, the judge noted that there was also likely probable cause to arrest defendant for misdemeanor hit and run, although she specifically declined to make such a finding. Contrary to the Attorney General's suggestion, such a finding would be immaterial because defendant would still have been denied a prompt determination of probable cause for the unlawful purpose of permitting the police to interrogate defendant regarding additional crimes.

unquestionably violated the Fourth Amendment, even though it extended less than 48 hours. (*McLaughlin, supra,* 500 U.S. at p. 56; *United States v. Davis, supra,* 174 F.3d at p. 944; *Willis v. City of Chicago, supra,* 999 F.2d at p. 288.)[7]

 It is not entirely clear, however, what the appropriate remedy for the violation should be. The Fourth Amendment does not expressly provide for the exclusion of evidence in the event its provisions are violated. (*Arizona v. Evans* (1995) 514 U.S. 1, 10 [131 L.Ed.2d 34, 115 S.Ct. 1185].) Exclusion, the remedy requested by defendant, is appropriate only if its application is likely to achieve substantial deterrence of official wrongdoing, and the cost of applying the rule—exclusion of reliable evidence—does not outweigh the benefits achieved by its application. (*United States v. Leon* (1984) 468 U.S. 897, 915–921 [82 L.Ed.2d 677, 104 S.Ct. 3405].) In *Powell v. Nevada* (1994) 511 U.S. 79, 84–85 [128 L.Ed.2d 1, 114 S.Ct. 1280], the United States Supreme Court held that *McLaughlin* should be applied retroactively, but declined to specify the proper remedy for the failure to determine probable cause in a timely manner, leaving it to the states to do so. On remand in *Powell,* the Nevada Supreme Court assumed exclusion was the proper remedy for the violation in that case but found the error harmless under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Powell v. Nevada* (1997) 113 Nev. 41 [930 P.2d 1123, 1126].) Although the California courts have not considered this issue, other states have uniformly agreed that the exclusionary rule applies to a *McLaughlin* violation. (*Chavez v. State* (Fla. 2002) 832 So.2d 730, 754; *State v. Huddleston* (Tenn. 1996) 924 S.W.2d 666, 673; *State v. Tucker* (1994) 137 N.J. 259 [645 A.2d 111, 117–119]; *People v. Willis* (2003) 344 Ill.App.3d 868 [801 N.E.2d 47, 56, 279 Ill.Dec. 755].) We agree.

---

[7] Contrary to the Attorney General's suggestion, circumstances relating to the shooting are not relevant to the analysis of the reasonableness of the detention. The trial court found there was no probable cause to hold defendant for any offenses arising out of the shootings and the Attorney General does not contend otherwise on appeal. The trial court's Fourth Amendment analysis, that the seriousness of the shootings justified an extended detention without probable cause, was flawed in this respect. The trial court applied the reasonableness test as follows: "I'm trying to look at the overall picture of what the police had. This is occurring in the very early morning hours. There is a person who is dead; a person who is in the hospital that nobody knows if they're going to live or die. [¶] And there does seem to be a delay. This vehicle, I think they have reason to believe that it was at the scene. So here is evidence of a very live crime that the police have. They also know since no one is under arrest, there is at least one firearm and a killer perhaps still loose in the streets; perhaps not still loose in the streets. And it seems to me that those equities have to weigh into it. . . . [¶] But I find basically the term unnecessary has to be viewed within the reasonableness of what was done. And the court does find that it was reasonable, under these circumstances, to have defendant wait there that extra time."

The exclusionary rule has been applied consistently in cases involving a warrantless arrest made without probable cause. (*Hayes v. Florida* (1985) 470 U.S. 811 [84 L.Ed.2d 705, 105 S.Ct. 1643]; *Florida v. Royer* (1983) 460 U.S. 491 [75 L.Ed.2d 229, 103 S.Ct. 1319].) The circumstances of a *McLaughlin* violation are the functional equivalent of such an arrest in that the arresting officer acts without necessary judicial guidance or objective good faith. (*State v. Huddleston, supra,* 924 S.W.2d at p. 673.) The application of the exclusionary rule to *McLaughlin* violations "will deter law enforcement officials from ignoring the Fourth Amendment mandate of a judicial determination of probable cause. [Citation.] Violations of *McLaughlin* can be easily avoided, and applying the exclusionary rule to evidence obtained as a result of the illegal detention will deter further violations." (*State v. Huddleston, supra,* at p. 673.)

■ That said, courts have applied different tests in determining whether statements made by a suspect during an unlawful detention should be suppressed under the exclusionary rule. Some jurisdictions have applied a voluntariness test. (*State v. Tucker, supra,* 645 A.2d at p. 117 ["delay in affording a defendant a probable-cause determination is a factor that courts should weigh, in the totality of the circumstances, in determining whether a confession during the period of detention was voluntary"].) Others, however, have applied the traditional analysis under the "fruit of the poisonous tree" doctrine enunciated in *Wong Sun v. United States* (1963) 371 U.S. 471, 485, 487 [9 L.Ed.2d 441, 83 S.Ct. 407], and *Brown v. Illinois* (1975) 422 U.S. 590, 599, 603–604 [45 L.Ed.2d 416, 95 S.Ct. 2254]. (*State v. Huddleston, supra,* 924 S.W.2d at p. 673; *People v. Willis, supra,* 801 N.E.2d at pp. 56–58.) We agree with those states that have applied the traditional Fourth Amendment analysis. "The voluntariness test is designed to protect the Fifth Amendment right against self-incrimination by excluding a statement that is obtained as a result of coercion by law enforcement officials." (*State v. Huddleston, supra,* at pp. 673–674.) The exclusionary rule, however, was designed to protect the unique interests implicated by a Fourth Amendment violation. As explained by the United States Supreme Court, "[A]lmost 90 years ago, the Court observed that the Fifth Amendment is in 'intimate relation' with the Fourth [citation] . . . . Frequently, as here, rights under the two Amendments may appear to coalesce since 'the "unreasonable searches and seizures" condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment.' [Citations.] The exclusionary rule, however, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. It is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits. In short, exclusion of a confession made without *Miranda* warnings might be

regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth. *Miranda* warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation. [¶] Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' [Citation.] *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment." (*Brown v. Illinois, supra,* 422 U.S. at pp. 601–602, fn. omitted.) Accordingly, under *Brown v. Illinois,* the question is whether "[the statement] was not 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.' " (*Id.* at p. 598.) And, while voluntariness is a threshold requirement, additional factors must be considered. (*Id.* at pp. 603–604.) "The temporal proximity of the arrest and the confession, the presence of intervening circumstances [citations] and, particularly, the purpose and flagrancy of the official misconduct are all relevant." (*Ibid.,* fns. omitted.)

 Applying these factors to the present case, defendant's statements to the police on April 30 should have been suppressed. Although the statements were voluntary, the remaining factors weigh in favor of suppression. While defendant had been detained only three hours before he began talking to the officer, the entire detention lasted over 16 hours and the most inculpatory statements were made in the 15th hour, at which point the detention was clearly illegal. Absent the unauthorized delay, defendant would have and should have been released since there was no probable cause to hold him on murder charges, and Vehicle Code section 40307 requires that defendant be admitted to bail within at most two hours. Defendant's extended detention based upon a traffic violation, for the sole purpose of questioning him about serious felonies for which there was no probable cause to arrest him, was a flagrant violation of both state law and the federal Constitution. There are no intervening circumstances that dispel the taint of the illegal detention. Accordingly, defendant's April 30 statements should have been suppressed.

d. *Defendant's May 3 confession was not the fruit of the illegal April 30 detention.*

Defendant does not argue that any independent Fourth Amendment violation required suppression of his May 3 statements. Instead, he argues that his May 3 confession should have been suppressed as the fruit of the April 30 violation because "[o]nly by means of the [April 30] detention did the police

obtain the name of Sean Marbley, and only by confronting appellant with Marbley's accusations did the police obtain his confession."

In *Wong Sun v. United States, supra,* 371 U.S. at pages 487–488, the United States Supreme Court stated: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (See also, e.g., *Brown v. Illinois, supra,* 422 U.S. at pp. 600, 602–604.) Although excluding certain evidence as the product of illegal police conduct, the court in *Wong Sun* held that the connection between Wong Sun's illegal arrest and his subsequent confession was " 'so attenuated as to dissipate the taint' " because Wong Sun "had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement." (*Wong Sun v. United States, supra,* at p. 491.) His later confession was "sufficiently an act of free will to purge the primary taint." (*Id.* at p. 486.)

■ Similarly, in the present case, before agreeing to go to the police station for additional questioning on the night of May 3, defendant was out of custody for three days. The trial court found that he voluntarily agreed to return to the station and substantial evidence supports that finding. Before further questioning began, defendant was reread the *Miranda* warnings and again expressly agreed to waive them. As in *Wong Sun,* the connection between the illegal detention and defendant's May 3 statements had become so attenuated as to dissipate any taint from the prior Fourth Amendment violation.

■ Marbley's participation in the May 3 police interviews does not alter this conclusion. Indulging in the assumption that the police would not have identified Marbley as a suspect in the absence of the prior illegal detention, "but for" is not the test of excludability. (*Wong Sun v. United States, supra,* 371 U.S. at p. 487; *Brown v. Illinois, supra,* 422 U.S. at p. 603.) The California Supreme Court has recognized that a defendant's confession is subject to suppression as fruit of the poisonous tree if the confession was induced by confrontation with illegally seized evidence or an illegally obtained statement from a codefendant. (*People v. Bilderbach* (1965) 62 Cal.2d 757, 767 [44 Cal.Rptr. 313, 401 P.2d 921]; *People v. Johnson* (1969) 70 Cal.2d 541, 546–549 [75 Cal.Rptr. 401, 450 P.2d 865].) Nonetheless, the ultimate question remains whether there is " ' "an intervening independent act by the defendant or a third party" to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality.' " (*People v. Storm* (2002) 28 Cal.4th 1007, 1031 [124 Cal.Rptr.2d 110,

52 P.3d 52], quoting *People v. Sims* (1993) 5 Cal.4th 405, 445 [20 Cal.Rptr.2d 537, 853 P.2d 992]; *United States v. Bayer* (1947) 331 U.S. 532, 540–541 [91 L.Ed. 1654, 67 S.Ct. 1394] [upholding admissibility of second confession made six months after illegally obtained confession, where defendant was out of custody during the interim and he received fair warning the second confession might be used against him].)

 Here, defendant was not confronted with a statement made by Marbley that implicated him in the crimes. Instead, Marbley and Jenkins were brought together, jointly interviewed, and then left alone to talk to each other. Marbley exercised his free will when he pled with defendant to help him go home by acknowledging that it was he who shot the two victims. Defendant, who was not then in custody, also acted freely in succumbing to his friend's entreaties. By these acts of free will, the causal chain between the illegal detention and defendant's subsequent confession was broken. " 'The fact that the name of a potential witness is disclosed to police [in an unlawful search] is of no evidentiary significance, per se, since the living witness is an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give. The uniqueness of this human process distinguishes the evidentiary character of a witness from the relative immutability of inanimate evidence.' " (*United States v. Ceccolini* (1978) 435 U.S. 268, 277 [55 L.Ed.2d 268, 98 S.Ct. 1054]; *Oregon v. Elstad* (1985) 470 U.S. 298, 308–309 [84 L.Ed.2d 222, 105 S.Ct. 1285]; see also *People v. Williams* (1988) 45 Cal.3d 1268, 1303–1304 [248 Cal.Rptr. 834, 756 P.2d 221] [codefendant's trial testimony need not be suppressed because "defendant presented little if any evidence to demonstrate that without the unlawful entry [codefendant] would not have talked to the police or agreed to testify for the prosecution; on the contrary, from the very beginning [codefendant] voluntarily cooperated with the authorities in the evident hope of receiving better treatment"]; *People v. Miller* (1967) 252 Cal.App.2d 877, 883–884 [60 Cal.Rptr. 791].) Defendant's confession was not obtained by exploitation of the illegal detention but as the result of Marbley's intervention and defendant's exercise of his own free will. The illegal April 30 detention therefore did not require suppression of the May 3 confession.

 In light of the admissibility of the May 3 confession, the failure to suppress the April 30 statements was not prejudicial. (*Chapman v. California, supra,* 386 U.S. 18.) In his April 30 statements, defendant admitted only to limited participation in the criminal acts. Had those been the only statements made by defendant and relied upon by the prosecution, the failure to suppress them might well have been prejudicial. However, the significance of the April 30 statements was diminished substantially by the full confession defendant gave on May 3. In view of the explicit description he gave on May 3 of the manner in which he personally assaulted and shot both victims, it is clear

beyond any doubt that his resulting convictions would not have been affected if the earlier and less incriminating statements had been excluded. Accordingly, the failure to suppress the April 30 statements does not require the judgment to be reversed.

2.–3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### Disposition

The judgment is affirmed.

McGuiness, P. J., and Parrilli, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 22, 2004. Werdegar, J., did not participate therein.

---

*See footnote, *ante*, page 1160.