Filed 9/28/21  P. v. Hanley CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>THOMAS Z. HANLEY,<br><br>        Defendant and Appellant. | A157228<br><br>(San Francisco County<br>Super. Ct. No. SCN202219) |

In April 2004, Thomas Hanley's mother, Ann Outin, was killed during a violent attack in her home.  That same month, a complaint was filed charging Hanley with the murder but proceedings were delayed due to concerns about Hanley's competency.  In 2007, Hanley was formally charged with first degree murder for financial gain.  (Pen. Code, §§ 187 & 190.2, subd. (a)(1); statutory references are to this code).  In 2008, Hanley filed a motion to suppress incriminating statements he made to police, which took years to resolve.  After Hanley's suppression motion was denied in 2012, he entered a plea of not guilty by reason of insanity.

In 2016, a jury convicted Hanley of second degree murder with an enhancement for personally using a knife.  (§§ 187 & 12022, subd. (b)(1)).  In 2018, the trial court found that Hanley was sane when he killed Outin.  He was sentenced to 15 years to life plus one year in prison.

1

On appeal, Hanley contends his suppression motion was erroneously denied and the prosecutor committed misconduct during closing argument to the jury. We agree with Hanley that investigators should have given *Miranda* warnings before they interviewed him at the police station, but we find no prejudicial error and thus affirm the judgment.

## BACKGROUND

### I. Prosecution Evidence

#### A. Background

In September 2003, Hanley began living at Crossroads, a residential placement facility in San Francisco designed to help young adults with mental health issues transition to independent living. For the most part, Hanley followed the program rules and he appeared to get along with residents and staff. In February 2004, however, Hanley told Crossroads program director, Maria F., that he wanted to move out because he was afraid of another resident named Ivan R. Hanley reported that Ivan was in a gang and that he extorted $100 from Hanley by threatening to kill him. Ivan denied Hanley's accusation, claiming that Hanley owed him $100 because he bought Ivan's jacket but failed to pay for it. Nevertheless, Hanley said he wanted to move back home with his mother, Ann Outin.

During most of February and March 2004, Hanley did not reside at Crossroads.[1] For some part of that time, Hanley had parties at Outin's house while she was on vacation in Europe. When Outin returned, she was upset with Hanley because of the parties and because her house had been damaged. On April 5, Hanley moved back into the Crossroads facility.

---

[1] Crossroads maintained a daily logbook where staff documented when residents left or returned to the facility, whether they took their medication, and other issues or conflicts that arose. A copy of the logbook was admitted into evidence at Hanley's 2016 murder trial.

On April 14, 2004, Hanley told Maria F. that he was worried about his mom because a former Crossroads resident named Anthony D. had told him that if Outin tried to get Anthony in trouble because of the parties, he would have her killed or kill her himself. Maria was aware that Outin wanted to talk to Anthony because Outin had called and asked for his contact information, which Maria refused to provide. When Maria suggested that Hanley call his mom and tell her about Anthony's threats, Hanley responded that the phone line was busy and he suspected it was off the hook. Maria suggested calling the police, which Hanley said he would do the following day.

### B. Hanley's 911 Call and the Crime Scene Investigation

On the morning of April 15, 2004, Hanley told Maria F. he was going to his mom's house for a family therapy session and he would call the police when he got back. Later, at around 11:00 a.m., Hanley called 911 and reported that his mother had "just been murdered." Hanley told the operator he did not see what happened; he had just arrived at his mom's house for family therapy and when nobody answered the doorbell he went around back. He found his mom on the floor and there was "blood everywhere."

When the 911 operator asked if Outin had been having "problems of some kind," Hanley reported his suspicions about Anthony D. Hanley explained that he had a party at his mom's house while she was on a trip to Paris and when she returned she discovered some of her things were missing. Hanley said that he had told Anthony that his mom wanted her things back and if Anthony did not return them she might "call the police or something." Hanley recounted to the operator that Anthony told him that he didn't care and wasn't worried and then said something like "I'll kill the bitch or whatever." The operator told Hanley the police would be there soon. Hanley

3

asked if he should open the door even though there was "blood all over the doors and everything." The operator told Hanley to try not to touch things and stayed on the phone until Hanley indicated the police had arrived.

Officer Etcheveste was one of several San Francisco police officers who responded to Hanley's 911 call. When Etcheveste arrived at Outin's house, Hanley was sitting on the steps of a neighbor's house. Sergeant Bosch, who was already at the scene, instructed Etcheveste to "stand with" Hanley, to not ask any questions, and to remember and report any statements Hanley made.

While Etcheveste waited with Hanley, he received updates on his police radio from officers who were conducting an initial search of Outin's house. Hanley appeared to listen to these updates with interest. When officers reported they were going to search an in-law unit in the basement of Outin's house, Hanley stated: " 'Oh, no, the officers are checking the first floor. That's where my knives collection is. It's under my bed where I used to stay. That's where Andy would look, yeah, when I saw my mom's feet.' " A short while later, Hanley said: " 'They were coming after me next. That Anthony [D.], I should have never let them over. I just wanted to see my mom. Damn, I came over this morning about 11:00 a.m. I rang the doorbell and waited for her to answer. I looked at the doorknob and saw some blood. I went over to the side of the house and saw the gate was opened. I thought that was weird. And I checked the back door and saw it wide open. I went inside and went upstairs and saw all this blood. Blood was splattered all over the place. I went into my mom's bedroom and saw her laying there. Man, I called the police. Damn it. I knew Anthony [D.] would kill her. Do you know he was— do you know he has been arrested for rape? Man, I can't believe this.' "

4

Homicide inspectors Everson and Maffei arrived at Outin's home shortly after noon. A sergeant directed the inspectors to Hanley, who was sitting on the neighbor's steps with his family therapist, Mr. Scott. After the inspectors introduced themselves and expressed their condolences, they told Hanley they would like to speak with him because he was the person who discovered his mother's body and called 911. The inspectors asked if Hanley would come to their office to give a statement and he said that he would. The inspectors made the same request of Scott because he had indicated that he came to the house to do a family therapy session with Hanley and Outin. Scott declined but said he would come in later. The inspectors asked if Hanley had a way to get to the Hall of Justice and when he said that he did not they offered to have someone drive him. Hanley said that was fine. A patrol officer drove Hanley to the Hall of Justice while the inspectors investigated the crime scene.

When Everson viewed the scene, he first noticed blood outside the house, on the stairs and front door. Inside, there was blood on the banister in the stairwell leading to Outin's bedroom. Outin's body was on her bedroom floor, partially blocking the door. Blood was everywhere and there were signs of a violent struggle. A television had been knocked to the ground and things were in disarray. A bloody knife handle with part of a blade attached was on a chair. A set of knives was found under a bed on the lower level of the home.

After the inspectors supervised the collection of evidence and canvassed the neighborhood for possible witnesses, they returned to the Hall of Justice to interview Hanley. Meanwhile, the medical examiner was called to the scene to receive Outin's body. After completing an autopsy, the medical examiner concluded that Outin bled to death as a result of sharp force and blunt trauma injuries, which included four stab wounds and six incised

5

wounds in the region of her neck and head, 38 incised wounds on her hands and wrists, and a total of 52 contusions, abrasions and lacerations on various parts of her body.

## C. Hanley's Interview and Recorded Statements

At around 4:00 p.m., Everson and Maffei began taking Hanley's statement, which was recorded, transcribed and admitted into evidence at Hanley's trial. After re-introducing themselves, the inspectors asked Hanley some general questions about himself and said that they "just want[ed] to find out what happened today."

Hanley stated that he was at Crossroads where he woke up at around eight or nine that morning. He described Crossroads as a residential facility for kids that have "been . . . arrested or whatever" and need rehabilitating. Maffei asked if Hanley had recently been arrested, but Hanley said that he had not. Hanley explained that although he had been on probation for several years, he "got off" and the only reason he moved to Crossroads was because he could not "deal" with the fact that his mom and his girlfriend were not getting along. Hanley said that his girlfriend had lived at his mom's house, but had gone to Oregon and killed herself, or so the police suspected.

Hanley stated that he walked the 30 minutes from Crossroads to his mom's house that morning because he had a family therapy appointment at 11:30. He arrived around 11:00 and noticed several unusual things: there was blood on the front door handle, the back gate was opened, and several doors in the back of the house were opened. Hanley made his way to his mom's room, saw blood and found her body. He was shocked and confused and immediately called 911.

Everson asked if Hanley had a key to his mom's house. Hanley did not; when he wanted to get in, he picked the lock with a small knife that he kept

in a planter box. Hanley volunteered that he was not "the only one that knew how to pick those locks," and began talking about parties he hosted at his mom's house. Anthony D. had invited people over who brought drugs and alcohol. Hanley did not think they should drink and drive, so he told them how to pick the locks so they could "crash" at his house. Hanley had several parties over a three-week period while his mom was away. Anthony D. was at every party. Anthony was a gang member who Hanley met at Crossroads. Hanley did not know where Anthony lived but had his phone number, which he had given to his mom because some things had been stolen from her home and she wanted to talk to Anthony about it. Hanley told the inspectors that he had warned Anthony that his mom was planning to get her things back and Anthony responded that he would kill Hanley's mom to avoid having to go back to jail.

Maffei asked Hanley where he had been the previous night. Hanley said he was at Crossroads with Ivan G. He spent the night in Ivan's room because he had a nightmare. Hanley often had a nightmare where he felt breathing on his neck, which he attributed to the fact that he had been molested from the age of seven to thirteen by a neighbor who still lived behind his mom's house. Hanley said that he had spent the last several days at Crossroads because he was not allowed to leave the facility unless he had an appointment. He spoke to his mom on the phone but had not seen her since the previous Friday when she came to Crossroads to drop off a needle and thread, so he could repair a rip in his shoe. Hanley showed the inspectors his shoe and Everson asked to see the bottom. At Everson's request, Hanley also showed Maffei.

Maffei said he was confused because Hanley had indicated that he was not allowed to leave Crossroads but then said that he and Anthony had

7

parties at Outin's house.  Hanley explained that he stopped going to Crossroads for about a month because he wanted to live at home.  During that period he did not "go to school or anything," he just had parties "day in-day out."  The inspectors asked when the last time Hanley was with his mom at her house.  Hanley did not remember what date he was last at the house but recalled that it was two days after Outin returned from her trip.  He had been told that if he went to the house again the police would be called on him, but then he called his mom and asked if he could pick up some things.  She agreed that he could come over that day on the condition that he "put the computer back together" and give her Anthony's phone number, which he did.

Hanley acknowledged that he argued with his mom about things that he should not have been doing, like having the parties, not going to school and making stupid mistakes.  They did not argue about drugs, although Hanley had taken many illegal drugs at the house when people brought them to his parties.  While talking about the type of people who came to his parties, Hanley said that one guy had pulled a knife on him because he did not pay for some "crystal."  The conversation turned to Hanley's knife collection, which he "hid" in the downstairs unit.  Hanley appeared to enjoy talking about his knives and used a note pad to "draw them out."  Hanley hid his knives in the downstairs unit because he did not want anyone to take them, but he told Anthony D. and Anthony's friends where the knives were even though he did not trust them.

Everson asked Hanley, "what do you think happened to your Mom?"  Hanley said he did not know, but he could think of four possible culprits:  the neighbor who had molested him; Anthony; or the guy who had pulled a knife on him at his party and the guy's friend, whose name was "Tank."  When Everson asked if Hanley's mom had a problem with anyone, Hanley

8

responded that she had a problem with Anthony. Hanley admitted that his mom was "really" mad at him because she had trusted him and he broke that trust by letting people into her house. When Everson asked if that was a heavy burden Hanley responded that he had let his mom down before and she always forgave him.

Everson asked how Hanley felt about his mom being dead. Hanley said he was shocked and upset and hoped the person who did it would get "the punishment . . . he deserves." Everson suggested that maybe the person needed "help, not punishment," which led to a discussion about how hard it is to live with guilt—guilt from killing someone and guilt from disappointing someone. Hanley said he had disappointed his mom so many times. Sometimes he just did not care and other times he had tried to kill himself because he felt so bad. He described some of his suicide attempts and how he used knives and razors to harm himself, showing the inspectors some fresh cuts on his hands.

Hanley acknowledged that it was a "huge" disappointment to Outin that Hanley had parties at her house. He thought about hurting himself, but he decided to face her and talk to her about it. There was an "argument," and his mom told him to "get the hell out of my house." But after they talked more, Outin said Hanley could come home if he started going to school or work or did something productive with his life.

Everson suggested again that the person who killed Outin might need help rather than punishment and said that the first step on the road to recovery is to admit what happened. Everson suggested there may have been an argument that got out of control. Hanley responded that Outin may have argued with Anthony D. He had told his mom to "talk nicely" if she did call Anthony because she tended to get really mad at people. When his mom got

9

angry at him, Hanley would try to be "the bigger person" and make her notice that she was wrong to yell.  Everson said that if Hanley knew who had hurt his mom and told who that person was, they could help him because he would need help dealing with his guilt.  After Hanley said, "[y]eah I know what you mean," Everson asked "[w]hat happened."  Hanley said he did not know; that was what he was "trying to figure out."  Everson said he thought Hanley did know, but Hanley denied it.

Everson asked if Hanley hurt his mom.  Hanley responded, "No, I was at the Crossroads the whole entire time."  Maffei suggested the neighbors had seen Hanley near the house.  He asked if Hanley understood that there is a "certain responsibility" that comes with committing a crime.  Everson asked if Hanley needed help and said that Hanley seemed nervous.  Hanley acknowledged needing help and then admitted that the knife that killed his mother was his knife.  Everson asked why Hanley "use[d] it."  Hanley became non-responsive, but then said it was about "[r]espect."  He had always tried to live up to his mother's expectations but never could.  Hanley became non-responsive again, failing to answer when asked if he wanted to talk about what happened and if he understood why he was at the police station.  The inspectors patiently repeated their questions, encouraged Hanley to relax, not to drift off and to have a conversation.  Then Everson asked, "Did you hurt your Mother?  Answer the question."  When Hanley did not respond, Everson said, "Tell me the truth," and Hanley said, "Yes."

Everson told Hanley to look at him and said, "I have something I need to tell you, okay."  He asked if Hanley understood he was at the police station.  Hanley said "[y]es," then Everson advised Hanley of his "*Miranda*" rights. (See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)  As Everson delivered the admonitions, Hanley interrupted, saying "Yes I know all that."

10

After Everson completed the warnings, Hanley confirmed that he understood his rights.

The inspectors started asking specific questions about what happened. Hanley either did not respond or gave non-substantive answers. Maffei acknowledged the situation was upsetting and suggested they talk about what happened after the incident. Hanley told the inspectors that he was not "the person to ask" about what happened, and he was not allowed to say the person's name. Maffei asked if the person was somebody inside of Hanley, and asked if that person could answer their questions. Then Hanley began providing substantive responses and even altered his voice as the interview progressed.

Hanley said that his friend Ivan told him to stab Outin, and Hanley did it because he wanted "respect." Ivan did not participate in the attack, but waited outside Outin's house. Ivan kept saying he wanted money and telling Hanley to get money from the house. Hanley told the inspectors that Ivan urged him to "[j]ust go in there, kill her and get it over with" because of all "the shit" that she had done to Hanley. He and Ivan had several conversations about this and Ivan told Hanley he would get at least half of Outin's money or more if he killed her. Then one night they snuck out of Crossroads and went to Outin's house. Hanley did not want to hurt his mom, but Ivan challenged him by calling him weak and questioning his power. When Hanley came outside after killing Outin, Ivan was proud and respected him. They went back to Crossroads, Hanley gave his clothes to Ivan and took a shower.

When Hanley started to become non-responsive again, Maffei asked what Hanley was thinking and what the "voice inside" was telling him. Hanley said that the voice was telling him not to talk and was worried about

11

where he would end up.  But then Hanley denied being tired and agreed that Everson could ask him another question, and the interrogation continued.  At first, Hanley maintained that he was not sure what happened in his mother's house, but then he told the inspectors that "he's showing me."  Hanley stated that "he" took the knife, stabbed Outin in the head three times, and tried to strangle her, break her neck and cut her throat.  Hanley wondered out loud why the person was showing him this and why the person had done this.

The inspectors took a break, leaving Hanley alone in the interview room for several minutes.  When Everson returned to the room, Hanley was sitting on the floor.  Everson helped Hanley back into his chair and the interview continued. Everson asked what else the person that Hanley had described said or made him do.  Hanley responded that the person told him he would get "everything [he] wanted," respect, money, power, and immortality.  Hanley said that "I didn't stab her, he did."  That person accosted Outin while she was in her bed, she fought back, and he used Hanley's hands to stab her and try to break her neck.

The conversation turned to Hanley's childhood and how Outin had mistreated him.  Then Maffei asked what Hanley did with his clothes after he got back to Crossroads.  Hanley responded that Ivan told him "how to do things," suggesting ways he could kill Outin and how to clean up.  Hanley said there were two people with him that night:  Ivan, who waited outside the house; and another person who was inside of Hanley.  This other person was "Jake the Devil" and he had been inside of Hanley for a few weeks, "[s]ince the party started."

Hanley said he went into his mother's room and stabbed her in the head three times.  She woke and got up "right away" and started screaming. She could not see Hanley because it was dark, and he wore a mask.  Hanley

12

wore plastic bags on his hands, which he left in the room. But he went back later and retrieved them and the knife, which he had to pry out of his mom's hand. Hanley put the bags and the knife in another plastic bag and threw it in a storm drain. He did not leave anything else at the house other than the handle of his knife, which broke off during the stabbing. Hanley agreed to show the inspectors the drain where he threw the knife. As they prepared to leave, Hanley asked what would happen to Ivan. Everson said that he could probably arrange for Hanley to see Ivan if he wanted to. After a brief hesitation, Hanley said that he did want to see Ivan.

After the interview, Hanley directed Everson to the storm drain as they rode in the back of an unmarked police car driven by Inspector Cleary. When they arrived at the drain, Everson got out of the car and made arrangements to retrieve the evidence. While Hanley waited in the car, he told Cleary that he had done "something terrible to his mother" and he was going to have to face his family. Cleary asked what Hanley had done with his bloody clothes and he responded that he put them in a backpack and threw them in a garbage can on the street. From the storm drain, officers recovered a bag that contained a bloody knife, knife handle and pair of latex gloves.

After the inspectors returned Hanley to the police station, he was put in an interview room with Ivan G. When they were alone, Hanley said "I did it. I confessed. It's weird." Ivan said that he did not want to confess and told Hanley, "[s]o I don't know where you live. Nothin. Nothin. I just, I just been to your house once and that was a long time ago." Ivan called Hanley "stupid," and asked what the police had said. Hanley responded that the police thought he was "completely insane." Ivan asked Hanley to confirm that Ivan had never asked him "anything about money." Hanley agreed and then said the police had "caught [him] right away," and he "couldn't lie"

13

because the neighbor had seen him. Hanley said the neighbor saw him and Ivan leave the house. Ivan told Hanley to shut up. He said he did not know anything "about this shit" and was "totally unaware of everything." Hanley nodded his agreement.

Hanley told Ivan he was going to jail that night. Ivan called Hanley stupid again and asked "[w]hy'd you do it?" Hanley said he did it for respect. Ivan told Hanley, "[y]ou're done." Hanley responded that he would probably get "a lifetime of psychiatric probation, five years in jail" or one year if he was "lucky." He said he was not "getting any lawyers," he would just "take whatever," and that his conscience was "clear now."

Ivan expressed disbelief about the situation. He said he had thought Hanley was just a "nice kid" who liked to play video games. Hanley wanted to know what Ivan thought of him now and Ivan responded, "Crazy man. What [is] your problem?" Hanley asked if Ivan would tell Anthony about what happened and then said, "I've been possessed." Ivan said he was scared of Hanley, and the two exchanged quips about whether Hanley might try to do something to Ivan.

## II. Hanley's Defense

At trial, the defense conceded that Hanley killed Outin and lied about it afterward but argued that he lacked the mental state to commit first degree murder. The defense argued that Hanley was guilty of manslaughter, or second degree murder at most, because his mental illness and lifetime of physical and emotional abuse caused him to decompensate to the point that he did not intend to kill Outin. The defense presented evidence that Hanley has suffered many traumas from the time he was an infant and struggled with mental health issues for many years. This evidence was presented by percipient witnesses who had provided services to Hanley and his family, as

14

well as expert witnesses who offered opinions about Hanley's mental health problems.

The defense focused on problems between Outin and Hanley to argue that Outin provoked Hanley to commit murder. Three defense witnesses were affiliated with a county mental health facility where Hanley received services when he was 12 and 13 years old. During that period, a concern arose that Hanley was being emotionally abused by Outin, who was perceived as punitive, authoritarian and openly critical of Hanley. The matter was referred to social services for consideration of an out-of-home placement, but that recommendation was not followed.

Another component of Hanley's defense focused on Ivan G. The defense argued that Ivan used Hanley as a tool and exploited his desperate need for acceptance. As support for this theory, the defense presented testimony from two former Crossroads residents who lived at the facility with Hanley and Ivan, Seth B. and Nancy M. Seth testified there were few rules at Crossroads and they were not enforced. The facility was locked at night, but it was easy to come and go. Seth recalled that Hanley was naïve and impressionable, while Ivan was a bully who acted like he was in a gang. Ivan played pranks and "messed" with other residents, including Hanley. Seth recounted an incident when Ivan convinced Hanley to allow Ivan to sodomize him with a stick by pretending it was a gang initiation. Seth also recalled that in early 2004, Hanley began playing video games obsessively. When Seth asked Hanley about it, he said he was preparing to kill his mother. Nancy M. testified about a statement she gave to police on April 16, 2004. Nancy could not remember much about the incident but her recorded statement was admitted into evidence. In that statement Nancy attempted to give Ivan an alibi and told the police that she and Ivan were together when Hanley

confessed to them that he killed Outin, but Nancy's timeline did not match with the facts.

The defense also relied on the prosecution evidence, including statements Hanley and Ivan made to the police. During closing argument, defense counsel urged the jury to find that the circumstantial evidence pointed toward innocence rather than guilt because it supported finding that Ivan was in the house when Outin was killed and that he manipulated Hanley and directed Hanley's actions.

## III. Jury Verdicts

The jury began deliberations on May 13, 2016. Over several days, they requested clarification regarding the meaning of the terms "provocation," "deliberately," and "conscious . . . disregard." On May 23, the jury sent a note stating they could not reach a verdict on first degree murder, but were close to a verdict on second degree murder. The court responded that the jury could consider the issues in whatever order they wished and that the court could not accept a verdict as to second degree murder unless all of the jurors agreed that the defendant was not guilty of first degree murder. On May 24, the jury returned verdicts finding Hanley not guilty of first degree murder but guilty of second degree murder. (§ 187, subd. (a).) They found true an allegation Hanley personally used a deadly and dangerous weapon. (§ 12022, subd. (b)(1).)

## IV. Sanity Phase

On May 26, 2016, court reconvened for the sanity phase of Hanley's trial. Both sides elicited testimony from their respective experts. The jury began deliberating on June 2. On the morning of June 8, the jury advised the court they were unable to reach a unanimous verdict and a mistrial was declared.

A second sanity phase was postponed for reasons that are not clear from the record.  At some point, the parties stipulated to a court trial, which began on November 30, 2018.  The parties agreed that the court could consider all evidence presented in earlier phases of the trial.  They presented additional testimony over seven court days before delivering closing arguments on December 17.  On December 18, 2018, the court found that Hanley was sane when he committed his offense.

## DISCUSSION

### I.  Suppression Issues

Hanley contends that all of his incriminating statements and their "fruit" should have been suppressed because the police violated his constitutional rights under the Fourth and Fifth Amendments.  "Although often factually overlapping, the exclusion of evidence under the Fourth and Fifth Amendments serves different constitutional objectives." (*People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1170 (*Jenkins*).)  Evidence is excluded under the Fourth Amendment in order to deter police misconduct while the exclusion of evidence under the Fifth Amendment protects " 'the suspect's right against compulsory self-incrimination.' " (*Ibid.*)  In the present case, separate consideration of these distinct issues is appropriate for the additional reason that Hanley did not make a Fourth Amendment claim in the lower court.

" ' "The scope of our review of constitutional claims of this nature is well established.  We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported.  [Citations.]  However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the

17

challenged statement was illegally obtained." ' " (*Jenkins*, *supra*, 122 Cal.App.4th at p. 1170.)

## A. Additional Background

### 1. Hanley's Motion

In 2008, Hanley filed a motion to suppress evidence obtained in violation of the Fifth, Sixth and Fourteenth Amendments. He argued that the inspectors violated his rights by: failing to deliver *Miranda* warnings before initiating a custodial interrogation; employing a two-step interrogation technique designed to elicit a confession before advising Hanley of his *Miranda* rights; and engaging in coercive tactics throughout the interrogation. Consequently, the defense sought to suppress the entire interview conducted by Everson and Maffei, evidence seized from the storm drain, and Hanley's recorded conversation with Ivan G.

In 2010, the court held an evidentiary hearing on Hanley's suppression motion but did not issue a ruling. In March 2012, the motion was assigned to Judge Massullo, who conducted a new evidentiary hearing. The court admitted extensive documentary evidence and exhibits, including audio and video recordings and transcripts covering the entire period that Hanley was in the interview room at the Hall of Justice on April 15, 2004. Pursuant to the parties' stipulation, the court considered transcripts of testimony from the following witnesses who had testified at the 2010 hearing: Officer Morgante, Inspector Jones, Inspector Cleary, and Dr. Richard Ofshe.

Morgante: Officer Morgante transported Hanley to the Hall of Justice at the request of Sergeant Bosch. Morgante testified that he put handcuffs on Hanley before the transport as a safety protocol because he was alone in the car with Hanley, and because he did not know how Hanley was involved in the homicide investigation.

Jones: Inspector Jones was at the Hall of Justice when he was notified that a person was being brought to the station in connection with a homicide. Jones testified that he did not know if the person was a witness or a suspect. He set up video equipment in an interview room and started running the video before Morgante arrived with Hanley. Upon their arrival, Jones escorted Hanley to the interview room and checked to see if he needed anything. Jones was present when an inspector from "crime scenes" came to take Hanley's DNA. Jones testified that he did not put in the order to collect Hanley's DNA. Nor did he order a "cable query" for Hanley, but he acknowledged that one was generated at 12:35 p.m. on April 15, 2004. A cable query reports a person's prior contacts with the police. Hanley's cable query was run at the Ingleside Station, not at the Hall of Justice.

Cleary: On the evening of April 15, 2004, Inspector Cleary assisted with the investigation of Outin's homicide. After Cleary was told that Hanley had waived his *Miranda* rights, he drove Everson and Hanley to the storm drain. Hanley directed them where to go. Cleary waited in the car with Hanley, who made an unsolicited statement that he felt terrible about what he had done to his mother. Then Cleary asked about Hanley's clothes and Hanley said he put them in a backpack and threw them in a garbage can.

Ofshe: Dr. Ofshe, a social psychology professor, testified as a defense expert on the subject of influence used during police investigations. Ofshe testified that the police made Hanley feel powerless by detaining him at the scene, transporting him in handcuffs, taking his DNA and making him wait to be questioned. Then, Ofshe opined, the inspectors used a psychologically coercive interrogation technique to elicit a confession by making an offer of leniency that induced Hanley to adopt their suggestion to act like he had a multiple personality disorder.

19

At the 2012 evidentiary hearing, the court heard live testimony from Officer Etcheveste, Inspector Suyehiro, Inspector Maffei, Inspector Everson and Dr. Gregory.

Etcheveste:  When Officer Etcheveste arrived at the crime scene, Sergeant Bosch told him to stand with Hanley while Bosch and other officers conducted a sweep of the house.  Bosch did not tell Etcheveste to physically restrain Hanley and there was no other officer in the vicinity who could potentially have prevented Hanley from leaving.  Etcheveste did not physically restrain Hanley or order him to stay.  Nor did Hanley try to get up and leave.  Etcheveste did not attempt to block Hanley from moving or take any action that, in his experience, would have constituted a detention.  He made small talk with Hanley, but did not ask him any questions.

At the suppression hearing, Etcheveste was shown a Computer Assisted Dispatch report (CAD), which stated that shortly after Sergeant Bosch arrived at Outin's house, he made a report to dispatch that he had one person detained at the scene.  Etcheveste testified that when he was at the crime scene, Bosch did not tell him Hanley had been detained.  After Etcheveste went back to his station at Ingleside, Bosch directed him to write in his report that Bosch had detained Hanley.

Suyehiro:  Inspector Suyehiro collected DNA evidence from Hanley's mouth and fingertips at around 1:35 p.m. on April 15, 2004.  The procedure was recorded and a copy of the recording was admitted into evidence.  Jones accompanied Suyehiro into the room and removed Hanley's handcuffs. Suyehiro described the collection procedure to Hanley before taking samples. Hanley asked a question about the oral swabs, which Suyehiro answered and then asked if that was "okay."  Hanley answered "yeah."  After Suyehiro took the swab samples, he asked Hanley to sign a form to indicate that he

voluntarily gave his DNA, telling Hanley that this would show his "cooperation." Hanley signed the form without expressing hesitation. At the suppression hearing, Suyehiro testified that he collected Hanley's DNA at the request of Inspector Jones, and that it was collected without a court order.

Everson: When Inspectors Everson and Maffei were dispatched to the scene of Outin's homicide, the dispatcher did not advise them that a person had been detained. At the scene, Sergeant Bosch pointed out Hanley, who was sitting with Scott, and told the inspectors Hanley was the victim's son and the person who called 911. Bosch did not say that anybody had been detained or arrested. When Everson went to the neighbor's steps to talk with Hanley, he viewed Hanley as a witness. The inspectors asked if Hanley was willing to come to the Hall of Justice to provide a statement without exerting pressure on him to agree. Everson asked Bosch to arrange a ride for Hanley, but did not tell anybody to restrain Hanley, nor did he tell anybody that Hanley had been detained or arrested.

Everson testified that Scott gave the inspectors background information about Hanley before he left the crime scene. Initially, Everson did not recall having this conversation, but his memory was refreshed with Maffei's contemporaneous notes. Scott reported that Hanley was "disabled" and lived in a halfway house at Crossroads, and that Outin had recently gone to Europe for about four weeks.

When Everson viewed the crime scene, his first thought was a burglary had gone bad. But he acknowledged under cross-examination that there was no indication that items had been stacked together as if someone was planning to steal things, and only a few rooms were disturbed. He also acknowledged that the circumstances he observed in the house raised the possibility of domestic violence, which is a major contributor to homicides.

21

As part of their crime scene investigation, the inspectors interviewed several neighbors who expressed concern about Hanley and his relationship with Outin.  Hanley was described variously as strange, inappropriate, violent, and a troublemaker.  The inspectors were told that Hanley had emotional problems, and that he and Outin had loud fights.  One neighbor reported that when he saw police cars at the house, he assumed Hanley had killed Outin or himself.  Another neighbor, who was a close friend of Outin, was sure Hanley did not kill his mom.  But Outin's friend was candid about Hanley's mental health problems and reported that he had tried to burn the house down when he was 12 years old.  This friend also reported that Anthony D. was Hanley's roommate at Crossroads and Hanley said he was a "gangbanger."

Everson testified that a cable report of Hanley's prior police contacts that was generated on the early afternoon of April 15 showed that Hanley was the subject of a 2002 "Tarasoff report."  Everson was aware that a doctor is required to make a Tarasoff report when a patient threatens to harm someone, but he testified that he did not see Hanley's cable report until after Hanley's interview.  Nor was Everson aware, prior to the interview, that Hanley was handcuffed and swabbed for DNA.  An officer at the crime scene must have ordered the DNA test but it was not Everson or Maffei.  Everson acknowledged that officers at the Hall of Justice had treated Hanley as if he was a suspect, but he testified that he would not have treated Hanley that way.  While Everson was at the crime scene, he did not communicate with officers at the Hall of Justice.

Everson testified that when the inspectors arrived at the Hall of Justice at around 4:00 p.m., Hanley was waiting for them in the interview room, alone and unrestrained.  At the beginning of the interview, they did not

advise Hanley of his rights because at that point Hanley was not a suspect, was not in custody, and was free to leave. During the interview, Hanley made statements that cast suspicion on himself, which led the inspectors to focus on Hanley's relationship with his mother. Once Hanley admitted that he hurt his mother, Everson advised him of his *Miranda* rights. Prior to that disclosure, Everson testified, the inspectors did not have grounds to detain or arrest Hanley.

Everson testified that he was not familiar with a two-step interview technique police interrogators use to withhold *Miranda* warnings when they are warranted. He had not received training about that tactic and never used it himself. Everson did know about a tactic for "softening up" a suspect before beginning an interview, but he did not use that tactic when he interviewed Hanley. Everson testified that the inspectors never threatened Hanley or promised him leniency.

Maffei: When Maffei arrived at the crime scene, Hanley was sitting on the steps with his family counselor and was not restrained. Maffei asked to speak with Hanley because he was a witness who found his mother dead in the house. Nobody told Maffei that Hanley was detained. Maffei did not issue any order or directive to Hanley but asked if he would come to the station to give his statement. Maffei did not want to have that conversation at the scene for privacy reasons and because he wanted access to recording equipment and other resources at the Hall of Justice. After Hanley agreed to come to the station and accepted the offer of a ride, Maffei did not tell any officer at the scene that Hanley had been detained. Nor was Maffei aware at the time that Hanley was transported in handcuffs or that he was swabbed for DNA. Maffei did not instruct anyone to place Hanley under arrest, handcuff him or restrain him in any way.

23

At the 2012 hearing, Maffei could not remember much about the information the inspectors gathered before they interviewed Hanley. Under cross-examination, he acknowledged knowing about Hanley's knife collection, which included an empty sheath, and that all of the neighbors had focused on Hanley without identifying any other possible suspect. Maffei did not run the cable inquiry about Hanley and did not recall when he saw it. Nor did he see Etcheveste's report prior to Hanley's interview.

Maffei testified that when the interview began, he considered Hanley to be a witness, not a suspect. In Maffei's mind, Hanley was not under arrest or detained and was free to leave. As the interview progressed, Hanley made statements that led the officers to probe whether he had been involved in the crime. Once Hanley disclosed that he hurt his mother, he was no longer free to leave and was advised of his *Miranda* rights. Maffei knew about an interview technique that involved making oneself "likeable" before administering *Miranda* warnings so that a subject would feel comfortable and free to speak, but he did not use that technique with Hanley. Nor did Maffei ever threaten Hanley or make any promise of leniency.

Gregory: Dr. Gregory is a clinical neuropsychologist who was retained by the defense to evaluate Hanley in 2007 and 2008. At the suppression hearing, Gregory testified that Hanley's mental deficits and history of childhood trauma are well documented in his records. Gregory offered the opinion that Hanley suffers from PTSD and that he is not malingering in presenting with cognitive deficits. Gregory also opined that when the inspectors interviewed Hanley in April 2004, he was experiencing symptoms of anxiety and dissociation that caused a decline in his cognitive function and impacted his judgment.

24

## 2. The Trial Court's Rulings

On June 11, 2012, Judge Massullo denied Hanley's suppression motion, announcing her decision at a hearing scheduled for that purpose. In reaching its decision, the court made the following findings:

First, Hanley was not detained at the murder scene. He was not subject to any physical restraint when he made unsolicited comments in front of Etcheveste. And he was still unrestrained and making voluntary choices when he agreed to go down to the station to give the inspectors his statement and accepted their offer of a ride.

Second, Hanley was not taken into custody at the Hall of Justice. Crediting Morgante's testimony, the court found that Hanley was placed in handcuffs because of officer safety concerns, not because he was a suspect. The court also relied on evidence that after DNA samples were taken, Hanley was asked to sign a release form. Because this after-the-fact release was invalid, the court suppressed the DNA evidence. However, this interaction was an objective indication that Hanley was made aware that his cooperation was not required.

Third, the court made an alternative finding that if Hanley was taken into custody prior to the inspectors' arrival at the Hall of Justice, Hanley's confession was not the fruit of an unlawful arrest. In addressing this issue, the court made an initial finding that officers did not have probable cause to arrest Hanley when they took his DNA. It went on to find, however, that Hanley's conduct after the DNA removal showed that he made the voluntary choice to wait for the inspectors and give them his statement. The court based this finding on evidence that Hanley signed the consent form after he was told it would signify his cooperation. Moreover, he was no longer in handcuffs and remained unrestrained in the interview room while he waited

25

for the inspectors. During that time, he slept for about an hour, and people checked in with him, asking if he was okay, if he wanted a soda, or to use the bathroom, or if he needed anything. Hanley never inquired about the wait, asked to leave or made any request other than to go to the bathroom. Escorting him to the bathroom was common practice, the court found, in light of security issues at a police station.

Fourth, the inspectors did not employ a two-step interview strategy designed to circumvent *Miranda*. The court based this finding on the testimony of Everson and Maffei, finding both officers were credible. The court also found that the inspectors' activities at the crime scene and the information they gathered prior to returning to the Hall of Justice were consistent with their testimony that Hanley was a witness not a suspect when the interview began. Moreover, when the inspectors arrived at the station, they were not aware that Hanley had been handcuffed or that his DNA was taken, so they were "simply carrying on . . . from where they left off" by talking to Hanley as "a witness, a very important witness, about what happened at the scene."

Fifth, Hanley's confession was voluntary and not coerced under the totality of the circumstances. Suggesting that the person who killed Outin needed help not punishment was not an offer of leniency, the court found. Statements Hanley made prior to the *Miranda* warnings were far less incriminating than statements he made afterwards. And, Hanley understood his rights, and knew those rights even before the *Miranda* warnings were given.

Finally, the storm drain evidence and Hanley's conversation with Ivan were not fruits of a poisonous tree. Not only was Hanley's confession voluntary, but he decided to go to the storm drain after he had been

26

*Mirandized* and booked. Nor had the defense shown that there was anything improper about recording Hanley's conversation with Ivan.[2]

## B. Analysis of Fifth Amendment Issues

Hanley contends that the trial court erred by failing to suppress all evidence of his April 15 interview because (1) his *Miranda* rights were violated; (2) coercive interrogation tactics rendered his entire statement involuntary; and (3) the court disregarded expert testimony establishing that Hanley was coerced.

The Fifth Amendment right against self-incrimination may be invoked to preclude the admission of involuntary pretrial confessions or other incriminating statements made by a defendant during coercive police interrogation. (*Dickerson v. U.S.* (2000) 530 U.S. 428, 433–435; *Oregon v. Elstad* (1985) 470 U.S. 298, 304 (*Elstad*).) "A determination of the voluntariness of a defendant's statements must be based upon the totality of the circumstances, including whether defendant was read and understood his *Miranda* rights, defendant's maturity, education and mental health, and any elements of coercion in the interrogation, the length of the interrogation, and its location." (*Jenkins*, *supra*, 122 Cal.App.4th at p. 1171.)

### 1. The *Miranda* Violation

The first issue raised by Hanley's Fifth Amendment claim is whether inspectors violated his rights by failing to give him *Miranda* warnings at the beginning of the April 15 interview. Unlike the trial court, we conclude that a *Miranda* violation did occur.

---

[2] In 2018, Hanley sought reconsideration of his suppression motion by Judge Chan, the trial judge in this case. Judge Chan held a hearing on the matter and denied Hanley's motion.

"In *Miranda*, the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination prevents the prosecution from using 'statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' [Citation.]  The court was concerned that, without these procedural safeguards, the 'inherently compelling pressures' of custodial interrogation might induce suspects to speak where they normally would not." (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 34 (*Bejasa*), quoting *Miranda*, *supra*, 384 U.S. at pp. 444 & 467.)

"Because a *Miranda* warning is only required once custodial interrogation begins, the defendant must necessarily have been in custody in order to assert a violation." (*Bejasa, supra*, 205 Cal.App.4th at p. 35.)  Here, the trial court found that Hanley was not in custody when inspectors began interviewing him on the afternoon of April 15, 2004.  That finding was error.

"Custody determinations are resolved by an objective standard:  Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest?  [Citations.]  The totality of the circumstances surrounding an incident must be considered as a whole." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403–1404, fn. omitted (*Pilster*).)  "[W]e look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 (*Aguilera*).)

"Although no one factor is controlling, the following circumstances should be considered:  '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the

28

ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' " (*Pilster*, *supra*, 138 Cal.App.4th at p. 1403.) Courts also consider "whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory.' " (*Id.* at pp. 1403–1404.) Importantly, the views and beliefs of officers involved in the incident are relevant only if those " 'views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.' " (*People v. Stansbury* (1995) 9 Cal.4th 824, 830.)

Here, Hanley initiated contact with the police by calling 911. Moreover, the record supports the trial court's findings that Hanley was not detained at the crime scene, that he consented to give a statement at the station, and that he accepted the offer of a ride. But Hanley was transported to the station in handcuffs, and when he arrived officers did not remove his handcuffs until they took his DNA without his prior consent. Then they had him wait in a police interrogation room for several hours without ever telling him that he was free to leave. Considered together, these circumstances would make a reasonable person experience restraint that was tantamount to a detention or arrest. Thus, under the totality of the circumstances, Hanley was in custody and entitled to a *Miranda* warning when the stationhouse interview began.

Resisting our conclusion, the People contend that by the time Hanley's interview began, a reasonable person would have felt free to terminate the

police encounter. Because the *Miranda* inquiry turns on "the degree of coercive restraint to which a reasonable citizen believes he is subject at the time of questioning," it is possible for officers to "sufficiently attenuate an initial display of force" that was used to effectuate a temporary detention "so that no *Miranda* warnings are required when questions are asked." (*People v. Taylor* (1986) 178 Cal.App.3d 217, 230, italics in initial quote omitted.) Here, the People argue that the use of handcuffs to transport Hanley to the Hall of Justice did not transform the consensual encounter into a custody situation because after the cuffs were removed officers treated Hanley like a witness who had agreed to give a statement rather than a suspect.

The trial court was persuaded by the People's argument. Based on its review of the interview room video, the court found that even if Hanley experienced an initial restraint of his liberty, he was not in custody when the inspectors began their interview because after the cuffs were removed, "sufficient time" passed before the inspectors arrived at the station and, during that period, Hanley was treated like a witness and not like a person who was in custody. We disagree with this reasoning. Police investigators do not collect DNA samples from mere witnesses. And, under these facts, the passage of time was not a factor that would lead a reasonable person to believe that he was no longer being restrained. After the handcuffs were removed, Hanley was not in a public place but in an interrogation room at a police station where nobody told him that he was free to leave. Although Hanley was not mistreated, that factor is hardly dispositive. Hanley was restrained with handcuffs for close to an hour, officers took DNA without his prior consent, and then left him to wait in a police interview room for several hours. Each of these events would be perceived reasonably as a display of

30

authority by law enforcement, and in combination they conveyed a clear message that Hanley was not free to leave.

The People rely on *In re Joseph R.* (1998) 65 Cal.App.4th 954. In that case, an officer who was investigating a complaint that two boys threw rocks at a bus questioned a boy while standing outside the home of the boy's friend. (*Id*. at pp. 956–957.) After placing the boy in handcuffs and putting him in the back of a patrol car for five minutes, the officer took the boy out of the car, removed the cuffs, and questioned him about the rock throwing complaint. (*Id*. at p. 957.) The boy's acknowledgement that " 'it was a pretty dumb thing for us to do' " was admitted into evidence at a subsequent court proceeding. (*Ibid*.) Warnings and waivers required by *Miranda* did not apply, the court found, because the brief detention to facilitate the officer's investigation was justified, the minor was released from the temporary restraint before the officer questioned him, the minor was not told that he was under arrest or had to answer questions, and after the brief encounter, the officer left the scene alone. (*Id*. at pp. 957 & 961.)

*Joseph R.* does not apply to the facts of this case. Using handcuffs while transporting Hanley may have been an appropriate safety precaution, but the cuffs were not removed until approximately 45 minutes after Hanley arrived at the Hall of Justice, and it appears that the reason the cuffs were removed was so that Inspector Suyehiro could take DNA samples without Hanley's prior consent. Nor was this a brief encounter in a public place. When Hanley's handcuffs were removed, officers left him in an interview room at a police station. And although they asked if Hanley was doing okay, they did not do anything to indicate that he was free to leave. Courts have found that *brief* handcuffing is not indicative of a formal arrest when, for example, an "interviewing officer informed the detainee the handcuffs were

31

temporary and solely for safety purposes," or the "officers considered the detainee only a witness in the investigation and advised the detainee he or she could decline to answer their questions." (*Pilster*, *supra*, 138 Cal.App.4th at p. 1404.) Absent such "mitigating facts" handcuffing "is a distinguishing feature of a formal arrest." (*Id*. at pp. 1404–1405.)

The People argue that circumstances pertaining to the interrogation itself and the manner in which it was conducted support the trial court's finding that Hanley was not in custody during the pre-*Miranda* phase of the interview. According to this argument, the inspectors treated Hanley like a witness, the encounter was "relaxed," the conversation "meandered," and there was "no confrontational questioning that would overtly telegraph that appellant's freedom of movement was restricted."

The manner in which an interrogation is conducted is relevant to the custody inquiry; courts consider whether the questioners were aggressive, confrontational, or accusatory. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) But they also consider the length of the interrogation and whether the police informed the person that he was free to terminate the interview and leave at any time. (*Ibid*.) Here, the pre-*Miranda* part of the interview was long, Hanley was never told that he was free to leave, and the officers' patient persistence in seeking answers when Hanley stopped responding to questions were all objective indications that Hanley was not free to terminate the encounter. (Compare *Green v. Superior Court* (1985) 40 Cal.3d 126, 131 [officer's request that defendant accompany him to the office for an interview included assurance that defendant could leave at " 'any time' "]; *People v. Spears* (1991) 228 Cal.App.3d 1, 22 [defendant told he was free to leave "on several occasions during the time he spent with the detectives"].)

Under the totality of the circumstances, Hanley was in custody when the April 15 interview began. However, we conclude that the erroneous admission of statements Hanley made during the pre-*Miranda* portion of his interview was harmless beyond a reasonable doubt. (See *People v. Thomas* (2011) 51 Cal.4th 449, 498.) During that part of the interview, Hanley attempted to shore up his narrative that Anthony D. was the killer, a story he first told Maria F. and then repeated to the 911 operator and to Etcheveste. When that narrative broke down, and Hanley admitted that he had "hurt" his mother, he was advised of his *Miranda* rights and waived them. Then he provided a detailed confession with a completely different narrative. Since statements that should have been excluded under *Miranda* were largely redundant of other trial evidence and materially less incriminating than the confession Hanley made after waiving his *Miranda* rights, admission of the unwarned statements was harmless error if Hanley's post-*Miranda* statements were properly admitted.

## 2. Post-*Miranda* Statements Were Admissible

Hanley contends that his post-*Miranda* confession should have been suppressed because the inspectors: (1) used an impermissible two-step interrogation technique to deliberately circumvent *Miranda*; and (2) coerced Hanley's confession by promising him leniency.

A *Miranda* violation does not render inadmissible statements made later after proper admonishments. " '[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.' " (*People v. Storm* (2002) 28 Cal.4th 1007, 1030–1031 (*Storm*), quoting *Elstad, supra,* 470 U.S. at p. 314.) When police provide *Miranda* warnings in the middle of an interview, "the admissibility of any subsequent

33

statement [depends] solely on whether it is knowingly and voluntarily made." (*Elstad*, at p. 309.)  Courts should assume the subsequent statement is made knowingly and voluntarily unless the police engaged in "coercive or improper tactics in obtaining the initial statement."  (*Id*. at p. 314.)

The *Elstad* presumption of voluntariness is undermined, however, when a "two-step interrogation technique" is used by officers "in a calculated way to undermine the *Miranda* warning."  (*Missouri v. Seibert* (2004) 542 U.S. 600, 622 (*Seibert*) (conc. opn. of Kennedy, J.).)  In *Seibert*, an officer who was conducting a custodial interrogation of a murder suspect elicited a confession that the defendant intended to kill the victim, then he *Mirandized* the defendant and used her unwarned statement to pressure her to make the same confession again.  (*Seibert*, at pp. 605–606 (plur. opn. of Souter, J.).)  At a subsequent suppression hearing, the officer testified that he "made a 'conscious decision' to withhold *Miranda* warnings" until he got the answer he wanted and then, after warning the defendant, to "repeat the question" until he got " 'the answer that she's already provided.' "  (*Ibid*.)  The trial court suppressed the defendant's prewarning statements but admitted her postwarning confession at a trial where she was convicted of second degree murder.  A divided Missouri Supreme Court reversed the conviction, finding that the defendant's postwarning confession was involuntary because it was the product of the first unwarned confession, and "distinguish[ing] *Elstad* on the ground that warnings had not intentionally been withheld there."  (*Ibid*.) The United States Supreme Court affirmed, albeit without a majority opinion.

Joined by three others, Justice Souter concluded that in all two-stage interrogation cases, the admissibility of warned statements depends on whether delivery of midstream *Miranda* warnings could reasonably be found

34

effective under the facts of the particular case. (*Seibert, supra*, 542 U.S. at pp. 611–612 (plur. opn. of Souter, J.).) Justice Kennedy, concurring in the judgment, rejected the plurality's test as too broad, concluding instead that the *Elstad* presumption of voluntariness applies to postwarning statements unless the police used a deliberate "two-step interrogation technique . . . in a calculated way to undermine the *Miranda* warning." (*Id.* at pp. 621–622.) Justice Kennedy found that the deliberate use of this tactic renders "postwarning statements that are related to the substance of prewarning statements [inadmissible] unless curative measures are taken before the postwarning statement is made." (*Ibid.*) "Because Justice Kennedy 'concurred in the judgment[] on the narrowest grounds' [citation], his concurring opinion represents the *Seibert* holding." (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1370 (*Camino*); see also *People v. Rios* (2009) 179 Cal.App.4th 491, 504 [collecting cases]; cf. *People v. Krebs* (2019) 8 Cal.5th 265, 309 (*Krebs*) [declining to decide if plurality opinion or Justice Kennedy's concurrence "provides the controlling standard" when the result was the same under either test].)

Here the trial court made an express finding that the inspectors did not engage in a deliberate two-step interrogation process to evade the protections of *Miranda*. We defer to the court's finding as it is supported by substantial evidence. (*Camino, supra*, 188 Cal.App.4th at p. 1372; *People v. Delgado* (2018) 27 Cal.App.5th 1092, 1105 & 1106 (*Delgado*).) In contrast to *Seibert*, the officers in this case testified that they did not use the tactic, nor is there any evidence that the tactic was a department policy. (Compare *Seibert, supra*, 542 U.S. at p. 606.) And, while the officer in *Seibert* admitted that he delayed giving *Miranda* warnings when they were warranted, the inspectors in this case testified unequivocally that they did not believe *Miranda*

warnings were required until Hanley disclosed that he hurt his mother. While the inspectors erred in delaying reading Hanley his rights, the *Miranda* violation was neither deliberate nor "calculated" as Justice Kennedy's concurrence would require. (*Id.* at pp. 621–622 (conc. opn. of Kennedy, J.); see also *Storm*, *supra*, 28 Cal.4th at pp. 1030–1031 [exception for " 'deliberately coercive or improper tactics' "].)

Hanley's concern about the length of the un-*Mirandized* portion of his interview is legitimate, but not dispositive. (See *Krebs*, *supra*, 8 Cal.5th at p. 312 ["simply because an officer could have given an advisement earlier is not enough to show that he delayed 'in a calculated way to undermine the *Miranda* warning"].) Much of the un-*Mirandized* interview was spent discussing general background information and prior voluntary statements Hanley made in an effort to divert attention to Anthony D. Importantly, there was little overlap between the few incriminating pre-*Miranda* statements and the substantive confession that Hanley made after he waived his *Miranda* rights. Moreover, Hanley's post-interview talk with his friend Ivan provides insight that the *Miranda* warnings "function[ed] 'effectively' as *Miranda* requires," in that Hanley appeared completely unperturbed about his post-*Miranda* statements. (*Seibert*, *supra*, 542 U.S. at pp. 611–612 (plur. opn. of Souter, J.).) He told Ivan he was not "getting any lawyers" and would just "take whatever," but that his conscience was "clear now." For all these reasons, we reject Hanley's contention that the admission of his postwarning confession violated *Seibert*.

Hanley's second argument is that his confession was involuntary despite the waiver of his *Miranda* rights. " 'A confession is involuntary under the federal and state guaranties of due process when it has been extracted by any sort of threats or violence, or obtained by any direct or implied promises,

however slight, or by the exertion of any improper influence. [Citation.] Coercive police activity is a necessary predicate to a finding that a confession was involuntary under both the federal and state Constitutions.'" (*Delgado*, *supra*, 27 Cal.App.5th at p. 1107.)

Hanley contends that his confession was involuntary because he was coerced by the inspectors' implied promise of leniency, which was conveyed through Everson's suggestions that Outin's killer needed help rather than punishment and that the inspectors wanted to help that person. When these challenged statements are viewed in the context of the entire interview, Hanley's coercion claim does not withstand scrutiny. The interview tape and transcript make clear that, to the extent Everson made a promise at all, it was an offer to help the killer deal with his guilt by telling the truth about what happened. Pointing out a benefit that flows naturally from a truthful course of conduct is neither a threat nor a promise of leniency. (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1212 [collecting cases].)

Even if Everson's statements could be construed as a promise of leniency, "[a]n improper promise 'must be causally linked' to the defendant's confession to warrant exclusion under the Fifth Amendment." (*People v. Wall* (2017) 3 Cal.5th 1048, 1066.) That link is not apparent here. Hanley's statement that he wanted the killer to receive the punishment he deserves prompted Everson's observation that the killer might need help instead of punishment. Hanley appeared to consider this idea, but he did not respond by making an incriminating disclosure. Hanley first acknowledged that he hurt his mother during a different part of the interview, right after Maffei suggested that a neighbor had seen Hanley outside Outin's house. Indeed, Hanley himself admitted to Ivan that this was the reason he confessed.

### 3. Dr. Ofshe's Expert Opinion

Hanley contends the denial of his suppression motion must be reversed because the trial court erred by disregarding the expert opinion of Dr. Ofshe. As noted, the parties stipulated that the court could consider a transcript of Ofshe's testimony from the 2010 evidentiary hearing, which was part of the extensive documentary evidence admitted at the hearing. According to Hanley, the court abused its discretion by "disregarding Dr. Ofshe's testimony" and the court's "failure to consider" that testimony was prejudicial error. The record belies these claims.

One of the last issues the court addressed in its oral ruling on the suppression motion was the defense claim that Hanley's confession was coerced. After summarizing the legal principles, the court stated that it had reviewed portions of the interview relied on by the defense as well as the testimony of both defense experts, Dr. Gregory and Dr. Ofshe. Then it found that under the totality of the circumstances Hanley's confession was voluntary. The court relied on evidence suggesting that Hanley "wanted to get the crime off his chest," and also found that the statements the defense construed as a promise of leniency "wasn't a promise at all." Then, the court turned to evidence of Hanley's personal qualities and considered whether his mental health problems impaired his ability to appreciate the consequences of what he was saying or what was happening at the time. In that context, the court discussed the opinions of both experts, finding Dr. Gregory's testimony helpful and Dr. Ofshe's opinions less so. Thus, the court did not fail to consider Ofshe's testimony as Hanley contends on appeal.

When discussing Ofshe's testimony, the court was critical, "candidly" observing that Ofshe was evasive and failed to answer simple questions during cross-examination. With the caveat that it had only a transcript

38

rather than Ofshe's live testimony, the court found that Ofshe was not credible because he seemed "jaded," and his testimony was so one-sided. On appeal, Hanley disputes this critique, characterizing it as a prejudicial abuse of discretion. We reject this claim, which is unsupported by citation to relevant authority or consideration of pertinent legal principles. The exclusion of admissible expert testimony may be reversible error (*People v. Cegers* (1992) 7 Cal.App.4th 988, 1001), but no evidence was excluded here. A trier of fact is not bound by an expert's opinion, even if only one expert testifies about the matter. (*People v. Williams* (1957) 151 Cal.App.2d 173, 187; see also § 1127b.)

### C. Analysis of Fourth Amendment Claim

Hanley contends that officers violated his Fourth Amendment rights by subjecting him to an unlawful detention at the crime scene and an unlawful de facto arrest at the Hall of Justice.

"The Fourth Amendment of the federal Constitution requires state and federal courts to exclude evidence obtained from unreasonable government searches and seizures. [Citation.] Penal Code section 1538.5 allows a defendant to move to suppress evidence obtained in an improper seizure." (*People v. Fews* (2018) 27 Cal.App.5th 553, 559.) Here, however, Hanley did not make such a motion. Instead, he brought a motion to suppress evidence obtained in violation of his rights under the Fifth, Sixth and Fourteenth Amendments. In making these claims, Hanley argued he was detained at the scene and subjected to a de facto arrest at the station, but he did not argue that these alleged restraints on his liberty were unlawful. Therefore, Hanley forfeited his Fourth Amendment claim. (*People v. Caro* (2019) 7 Cal.5th 463, 488 (*Caro*); *People v. Miranda* (1987) 44 Cal.3d 57, 80.)

39

Hanley contends his trial counsel rendered ineffective assistance by failing to allege a Fourth Amendment violation. To prove an ineffective assistance claim, the defendant must establish that his trial counsel's representation was deficient and that this deficiency caused him prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–692.) To carry this burden here, Hanley must first show that trial counsel's failure to litigate a Fourth Amendment claim was objectively unreasonable in that it was contrary to prevailing professional norms. (*Caro, supra,* 7 Cal.5th at pp. 488–489.) "The prejudice prong of *Strickland* then requires the defendant to 'prove that [the] Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence.' " (*Caro,* at pp. 488–489.)

Hanley takes the view that his ineffective assistance claim proves itself because *all* evidence of his guilt was subject to exclusion under the Fourth Amendment, and thus there can be no reasonable explanation for failing to bring this claim. This conclusory proposition does not satisfy Hanley's burden of proof. Nevertheless, we consider three categories of evidence that could potentially have been excluded under the Fourth Amendment.

### 1. Hanley's Statements to Etcheveste

First, Hanley intimates that statements he made in front of Etcheveste were the product of an illegal detention. This claim fails on its merits because Hanley was not detained at the crime scene.

"Not all interactions between law enforcement and members of the public rise to the level of seizures implicating the Fourth Amendment. [Citation.] For a seizure to occur, an officer must intentionally restrain an individual's freedom of movement either physically or through a show of authority. [Citations.] A seizure through a show of authority occurs when a

40

reasonable person would not believe he or she is free to leave or to decline an officer's request. [Citation.] The reasonableness of an officer's conduct must be viewed in light of all the circumstances surrounding the incident." (*People v. Bates* (2013) 222 Cal.App.4th 60, 65.) "The test is 'objective,' not subjective; it looks to 'the intent of the police as objectively manifested' to the person confronted. [Citation.] Accordingly, an 'officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant . . . .' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.)

Here, Hanley called the police to the scene of his mother's murder, made unsolicited statements about matters that were material to the crime, agreed to go to the station to provide a statement that would help with the investigation, and accepted the offer of a ride. When Hanley made each decision, he was not subject to any physical restraint and there is no evidence of a threat, application of force, or any other police conduct that prevented Hanley from leaving the scene. On appeal, Hanley contends he was detained because Etcheveste stood very near him and positioned himself in a way that blocked Hanley from leaving. The trial court found that Hanley was not physically restrained, blocked or otherwise prevented from leaving. These findings are supported by testimony from Etcheveste, Everson and Maffei. On appeal, we defer to factual findings supported substantial evidence. (*People v. Leyba* (1981) 29 Cal.3d 591, 596–597.)

In his appellate brief, Hanley mentions several times that he was pat searched by fire department personnel and intimates this intrusion was unjustified. Hanley's only support for this undeveloped claim is a citation to testimony Maffei gave at the 2010 suppression hearing. According to that testimony, a few weeks after Hanley's confession, Maffei interviewed the fire department officers who responded to Outin's house and they told him that

they frisked Hanley because he was acting "creepy." This evidence does not show that an initial pat search was unlawful or that it had anything to do with incriminating statements that Hanley later made to Etcheveste.

## 2. DNA Evidence

DNA samples taken from Hanley are a second type of evidence raising Fourth Amendment concerns. As discussed, Hanley's DNA was removed without his prior consent under circumstances indicating that he was in custody. Thus, the removal of Hanley's DNA could have supported a Fourth Amendment claim. However, the failure to bring such a claim was not ineffective assistance of counsel on this record because Judge Massullo excluded the DNA evidence.

## 3. Hanley's Interview

For reasons we have explained, Hanley was in custody when he was interviewed at the Hall of Justice. Because his encounter with police was no longer consensual by the time the inspectors arrived to interview him, he was subject to a seizure under Fourth Amendment principles. (*People v. Celis* (2004) 33 Cal.4th 667, 673 (*Celis*).) Hanley contends that because this seizure of his person was unjustified, all statements made during his interview should have been suppressed. The issue on appeal is whether trial counsel rendered ineffective assistance by failing to litigate this Fourth Amendment claim.

" '[N]ot all seizures of the person must be justified by probable cause to arrest for a crime.' " (*Celis*, *supra*, 33 Cal.4th at p. 674.) "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224,

231.) "There is no fixed time limit for establishing the constitutionality of an investigatory detention. Rather, such a detention will be deemed unconstitutional 'when extended beyond what is reasonably necessary under the circumstances that made its initiation permissible.' " (*People v. Gomez* (2004) 117 Cal.App.4th 531, 537–538.)

Circumstances may develop that "provide reasonable suspicion to prolong the detention." (*People v. Russell* (2000) 81 Cal.App.4th 96, 102.) But if a detention becomes overly intrusive and exceeds the boundaries of a permissible investigative stop, it becomes a de facto arrest requiring probable cause. (*People v. Stier* (2008) 168 Cal.App.4th 21, 26–27.) Probable cause "exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime." (*Celis*, *supra*, 33 Cal.4th at p. 673.)

In light of these principles, competent counsel could have concluded that after Hanley arrived at the Hall of Justice to give a consensual interview, detaining him until the inspectors returned from the crime scene was justified by a reasonable suspicion that Hanley was involved in his mother's murder. Because the record shows that Hanley was taken into custody through the collective action of several officers, all of the officers who participated in the investigation "constructively shared the same pool of information under the collective knowledge doctrine." (*Cornell v. City and County of San Francisco* (2017) 17 Cal.App.5th 766, 780; see also *People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1555.) Thus, at the outset of Hanley's interview, the officers had the following pertinent information: Hanley and Outin's relationship was fraught; Hanley was living in a half-way house but had parties at his mom's house while she was away, which had angered Outin; Outin was the victim of a violent attack that was consistent with

domestic violence; Hanley had mental health and behavioral problems; the murder weapon may have been Hanley's knife, which he kept hidden; Hanley had made unsolicited incriminating statements about his knife collection and about Anthony D.; and Hanley had been the subject of a Tarasoff report, which meant he had made a credible threat of violence against someone in the past.

Moreover, even if a Fourth Amendment violation could have been established, it would not require suppression of Hanley's confession absent a causal link establishing that the confession was obtained by exploitation of the illegal detention. (*Jenkins*, *supra*, 122 Cal.App.4th at pp. 1178–1180.) This issue turns on "whether 'intervening events break the causal connection between the illegal [detention] and the [incriminating statement] so that the [statement] is " 'sufficiently an act of free will to purge the primary taint.' " ' " (P*eople v. Boyer* (1989) 48 Cal.3d 247, 268.) Here, although a reasonable person in Hanley's position would not have felt free to leave the Hall of Justice, he never expressed a desire to leave, either by words or actions. Nor did the officers actually prevent Hanley from leaving. Further, there is strong evidence that Hanley wanted to be there and wanted to discuss his mother's murder with the inspectors.

In addition to these obstacles to proving that Hanley's confession was the product of an unlawful detention, the record suggests a tactical reason for electing not to purse this Fourth Amendment challenge: it would potentially undermine Hanley's Fifth and Sixth Amendment claims. The defense, joined by Ivan's counsel, presented a strong argument that the police had reason to focus on Hanley from the outset of their investigation and, by the time the inspectors arrived at the Hall of Justice, Hanley was their prime suspect. This theory was important to the defense in more than one way. They used it

44

to argue that Hanley's entire interview was a custodial interrogation, to challenge the credibility of officers who claimed that Hanley was treated as a witness rather than a suspect, and to argue that the inspectors intentionally violated *Miranda* by employing an improper two-step interrogation technique. Under these circumstances, defense counsel may have been concerned that bringing an additional Fourth Amendment challenge would be counterproductive because it would highlight evidence suggesting that Hanley was not a suspect and could not reasonably have been detained at the outset of the interview.

Thus, competent trial counsel could have concluded that a Fourth Amendment challenge was not only potentially inconsistent with Hanley's Fifth Amendment claim but would have been more difficult to prove, and thus made a reasonable tactical decision to litigate only the Fifth Amendment claim. Hanley has failed to carry his burden of showing that he was denied the effective assistance of counsel.

## II. Prosecutor Misconduct

Hanley contends the prosecutor engaged in "egregious" misconduct during closing argument, which resulted in a denial of due process. " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Montes* (2014) 58 Cal.4th 809, 869.)

When a misconduct claim is based on the prosecutor's remarks to the jury, "the defendant must show that, '[i]n the context of the whole argument

45

and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).) Generally, trial court rulings on prosecutor misconduct are reviewed for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

## A. Appealing to Passion and Prejudice

The prosecutor concluded his initial closing argument by discussing the implications of evidence that Hanley tried not to get caught. Counsel argued this evidence showed that Hanley knew the consequences of his conduct and once he got caught, he tried to avoid those consequences by fooling the inspectors. The prosecutor urged the jury not to be fooled by letting Hanley get away with murder, stating: "He had a coverup. First Anthony [D.], then Jake the Devil. [¶] Don't let him get away with murder. Mr. Hanley murdered Anne Outin in the first degree and he did it for financial gain. [¶] Please return verdicts accordingly." Outside the presence of the jury, defense counsel objected that the prosecutor inflamed the passions of the jury. The trial court stated that this remark did "not rise to that level." So the court noted the objection for the record but did not give an admonition.

On appeal, Hanley contends that urging the jury not to let Hanley get away with murder was an act of "misconduct," but he cites no authority and provides no analysis. " 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116,

1179.) Here, the trial court's finding that the prosecutor did not cross this line was not an abuse of discretion.

### B. Commenting on the Defendant's Silence

During Hanley's closing argument, defense counsel argued that evidence proving that Ivan manipulated Hanley to commit the homicide could be found in the recorded witness statements made by Hanley, Ivan G., and Nancy M. The prosecutor disputed this claim during his rebuttal, and urged the jury to evaluate this evidence as they would evaluate any statement by a witness. In this context, the prosecutor made the following argument:

"With regard to the statements by Nancy [M.], Ivan [G.], and Mr. Hanley, and all other witnesses, you're given instruction 226. That's the instruction that tells you how to evaluate witnesses. [¶] We discussed this during jury selection. You look at their demeanor. You compare their statements against other statements. You compare these statements against the evidence, and you determine whether you will believe some, part, all or none of the statement. [¶] When it refers to witnesses in 226, you can take that as Nancy, as Ivan, and as Mr. Hanley. Evaluate their statements according to the way you would evaluate any other witness."

Then the prosecutor immediately focused on Nancy M.; questioning why Nancy was called as a defense witness, the prosecutor argued that although Nancy got some facts wrong, her statement was evidence that Hanley did intend to kill Outin.

For the first time on appeal, Hanley contends this argument by the prosecutor violated *Griffin v. California* (1965) 380 U.S. 609. *Griffin* holds that the Fifth and Fourteenth Amendments to the United States Constitution "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin*, at

47

p. 615.)  Hanley posits that the prosecutor violated *Griffin* here because he told the jury to treat Hanley like any other witness in order to draw attention to the fact that Hanley did not give live testimony.  Hanley forfeited this claim by failing to make a *Griffin* objection in the trial court.

We are not persuaded by Hanley's rejoinder that the failure to object was a denial of his right to the effective assistance of counsel.  The decision whether to object during opposing counsel's arguments in a criminal trial " 'is inherently tactical, and the failure to object will rarely establish ineffective assistance.' "  (*People v. Lopez* (2008) 42 Cal.4th 960, 972.)  Because competent counsel may often elect to forego even a valid objection, the tactical decision whether to object is " 'not ordinarily reviewable on appeal.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1197.)  Here, competent counsel could have concluded that there was little likelihood the jury or trial court would interpret the prosecutor's argument as a comment on Hanley's decision not to testify at trial.  On the other hand, making a *Griffin* objection would have risked focusing the jury's attention on that very fact.  Thus, failing to make a *Griffin* objection did not constitute ineffective assistance of counsel.

## C.  Alluding to Punishment

At the end of his rebuttal argument, the prosecutor responded to a closing argument by defense counsel that Hanley should be convicted only of manslaughter because he lacked the intent to kill.  The prosecutor argued that involuntary manslaughter made no sense in this case and that it would be more appropriate to acquit Hanley completely.  In presenting this argument, the prosecutor stated:  "Do not convict him of involuntary manslaughter.  Walk him out the door.  Acquit him."  Defense counsel objected on the ground that the prosecutor's argument referenced punishment.  This objection was sustained.  Completing his argument, the

48

prosecutor argued that acquittal made more sense than involuntary manslaughter but the evidence showed that what Hanley actually did was commit first degree murder.

To the extent that the prosecutor's argument can be construed as an improper remark about punishment, the trial court sustained defense counsel's objection on that ground. And, although the jury was not admonished then, it was subsequently instructed with CALCRIM No. 3550. In delivering that instruction, the court stated: "As I said before—I will repeat it now—you must reach your verdict without consideration of punishment." In light of this admonition, the prosecutor's reference to punishment was not prejudicial under any standard of error.

On appeal, Hanley argues that the prosecutor's remark constituted prejudicial misconduct because he subverted the administration of justice by presenting the jury with an all or nothing choice to either convict Hanley of murder or acquit him and deprive him of the mental health services he desperately needed. Hanley forfeited this claim by not making it at trial. In any event, Hanley fails to show that "there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.) It is not reasonably likely the jury interpreted the prosecutor's argument as requiring them to either convict Hanley of murder or deprive him of mental health services by acquitting him.

## DISPOSITION

The judgment is affirmed.

TUCHER, J.*


WE CONCUR:

POLLAK, P. J.
BROWN, J.

*People v. Hanley* (A157228)

---

 * Presiding Justice of the Court of Appeal, First Appellate District, Division Three, sitting by assignment pursuant to article VI, section 6 of the California Constitution.